UNITED STATES of America, Appellee,

v.

**Jose Vidal NIEVES and Maria Isabel Figueroa, Appellants.**

Nos. 926, 927, Dockets 79–1051, 79–1052.

United States Court of Appeals,
Second Circuit.

Argued April 23, 1979.

Decided Oct. 30, 1979.

Ruth A. Nordenbrook, Mary McGowan Davis, Asst. U. S. Attys., Edward R. Korman, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for appellee.

Barry Bassis, New York City (Legal Aid Society, Fed. Defender Services Unit), for Figueroa; William F. Hanrahan, Bellmore, N. Y., on the brief (no·oral argument), for Nieves.

Before WATERMAN, FEINBERG and MANSFIELD, Circuit Judges.

* We note that by memorandum the late Judge Gurfein agreed to the foregoing in substance.

WATERMAN, Circuit Judge:

Jose Vidal Nieves and Maria Isabel Figueroa appeal from judgments entered in the United States District Court for the Eastern District of New York (Neaher, District Judge) on December 1, 1978, convicting each of them, upon their pleas of guilty, of one count of knowingly and intentionally importing into the United States approximately 984.3 grams of cocaine, a Schedule II narcotic drug controlled substance, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1). Nieves was sentenced to three years imprisonment, with the court directing that he be incarcerated for six months, and that the execution of the remainder of the sentence be suspended. Nieves also was placed on probation for five years, and was required to serve a special five year parole term. Figueroa was sentenced to five years probation pursuant to the Youth Corrections Act, 18 U.S.C. § 4216. Execution of these sentences was stayed pending disposition of this appeal.

Nieves and Figueroa entered their guilty pleas pursuant to a court approved agreement between them and the government preserving their right to appeal the court's denial of their motions to suppress certain physical evidence and post-arrest statements.[1]

Nieves challenges the denial of his suppression motion on the grounds that the border search performed on him at the time of his entry into the United States from Panama at John F. Kennedy International Airport was unreasonable, in violation of the Fourth Amendment. Figueroa challenges the denial of her suppression motion on the grounds that the secondary search of her person, conducted after she had successfully completed a regular customs inspection, was not a valid border search. She, too, alleges that the search, absent a border search justification, was unreasonable, in violation of the Fourth Amendment. For the reasons set forth below, we affirm the district court's denial of the suppression motions, and thus uphold the convictions of Nieves and Figueroa.

I

On the evening of July 12, 1978, Customs Patrol Officer John Boyle was on duty at the International Arrivals Building at JFK International Airport. Boyle observed Nieves presenting his luggage and entry documents to the regular customs inspector who was examining passengers arriving on Braniff Flight 906 from South America. Boyle's attention was drawn to Nieves because he was carrying only one small bag, did not have any gifts or souvenirs that would have marked him as a tourist and did not look like a businessman. Boyle's suspicions were aroused by these circumstances, and he made inquiries of the customs inspector who was examining Nieves's things. Boyle looked at Nieves's passport, and noted that Nieves was born in Puerto Rico, was returning from a vacation trip to Panama, and had been away for four or five days. Boyle then told the customs inspector that he wanted to "check out" Nieves after the initial inspection was completed.

Nieves was taken from the inspection line to the private search room, where he was patted down and told to remove his shoes. Boyle noticed that the inner sole of Nieves's shoes appeared to be homemade. He obtained a drill, and proceeded to bore small holes through the inner soles of the shoes. This core sampling procedure disclosed the presence of a white powder under the inner soles of the shoes, which a contemporaneous field test established to be cocaine. At this point, Nieves was placed under arrest and advised of his constitutional rights. Nieves indicated that he understood his rights and that he did not wish to cooperate. He was then asked to remove his pants so that a

---

1. In return for their pleas of guilty on the importation count, the government also agreed to drop related possession and conspiracy counts against Nieves and Figueroa.

The procedure under which a defendant may enter an agreement to plead guilty while preserving an issue for appeal has been approved by this Court in several recent cases. *See United States v. Price*, 599 F.2d 494, 495 n.1 (2d Cir. 1979); *United States v. Rico*, 594 F.2d 320, 321 n.1 (2d Cir. 1979).

further search of his person could be conducted. No other narcotics were uncovered in this subsequent search.

After this search was completed, Nieves was turned over to Agent Arthur Rose of the United States Drug Enforcement Administration (DEA). Rose took Nieves to the DEA office at the airport where Nieves was again advised of his constitutional rights. When Nieves was asked whether he wished to waive his rights and cooperate, Nieves responded affirmatively, and told the agents how he had become involved in the cocaine venture. He also told the agents that he was to be contacted in the airport lobby by an unknown man. Nieves then agreed to go to the lobby, under the watch of several DEA agents, to see if someone would contact Nieves in an attempt to take delivery of the drugs. After half an hour passed without any contact, the agents and Nieves proceeded back to the DEA office. En route to the office, one of the agents (Huber) noticed that the suitcase Nieves was carrying had a felt stripe with a buckle running down its side, and remembered that during the surveillance in the lobby he had seen a woman standing beside a similar bag with an identical stripe running down its side. Huber told his colleagues what he had observed, and while the other agents proceeded to the DEA office with Nieves, Huber and another agent (Murphy) returned to the lobby to attempt to locate the woman that Huber had seen earlier.

Upon returning to the lobby, the agents located the woman (appellant Figueroa) immediately. Murphy maintained surveillance while Huber summoned a customs inspector. Upon his return, Huber approached closer to Figueroa, and noticed that her bag, in addition to appearing identical to Nieves's, bore a similar baggage identification tag. In the proceedings in the district court, Huber testified that Figueroa, standing in the airport lobby, "appeared to be confused, if not lost; she was not being met nor was she meeting anyone outside, and this was, as I understood it, just what Nieves was supposed to do." On the basis of these observations, Huber contacted Figueroa, identified himself, and asked her for identification. She produced a passport, but her response indicated that she did not understand English well enough to be interrogated further by him. Huber then asked Figueroa to accompany him back to the customs area, where she could be interrogated by a Spanish speaking customs officer.

While Figueroa was being escorted back to the customs area, Murphy returned to the DEA office, where he announced that they had "the woman" in custody. Upon hearing this, Nieves told Rose that the woman also had cocaine in her shoes. Murphy immediately called Huber in the customs area and advised him of what Nieves had said. At about the time of this phone call, Huber was shown Figueroa's customs declaration form, which indicated that Figueroa's address was the same as Nieves's[2] and that the two had entered the United States on the same flight from Panama. Huber then placed Figueroa under arrest, and called a female customs inspector to conduct a search of Figueroa. The female customs inspector took Figueroa to a private inspection room, where she instructed[3] Figueroa to remove her slacks and shoes. Sewn to the inside waistband of the slacks was a cloth strip holding a plastic tube that contained white powder, which subsequent testing established to be cocaine. Cocaine also was discovered in the soles and heels of Figueroa's shoes.

After the search was completed, Figueroa was handed a printed card, which set out her constitutional rights in Spanish. Later, when Figueroa arrived at the DEA office, she was advised of her constitutional rights by an agent who spoke Spanish. She indicated to this agent that she understood her

---

**2.** At the suppression hearing, Huber testified that even though he had not been involved in the original search and arrest of Nieves, he had been informed of Nieves's address.

**3.** Because the customs inspector did not speak Spanish, she employed hand gestures to communicate with Figueroa during the search.

rights, and was prepared to cooperate, whereupon she related to the agent substantially the same account of her involvement in the cocaine venture that Nieves had given earlier.

After the suppression hearing, the district court concluded that the search of Nieves was a valid border search, and on the basis of *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), was *per se* reasonable.

As to Figueroa, the court found that, although she had passed through the customs clearing point, she had not yet left the Arrivals Building, and was still in close proximity to the customs area. Therefore, the court concluded that the subsequent search of her person was a valid border search, and further noted that the temporary stop and detention of Figueroa was reasonable due both to the agents' observations of Figueroa and the information which they possessed as a result of the earlier arrest and search of Nieves.

Finally, the district court determined that both Nieves and Figueroa had been advised fully and effectively of their constitutional rights, and that each had made a knowing and intelligent waiver of those rights.

## II

Appellant Nieves advances two grounds in support of his contention that the border search performed on him was unreasonable, in violation of the Fourth Amendment. First, he alleges that the search was unreasonable because the customs officers lacked probable or reasonable cause to justify their actions. We will discuss this contention only briefly, as we find it to be wholly without merit.

Of necessity, the law governing the inspection of travellers crossing our national boundaries is responsive to a different set of imperatives from those that guide law enforcement officers in their investigative contacts with persons who already are within this country. It long has been established that routine border searches, conducted for the purpose of controlling the movement of people and goods across our national boundaries, do not violate the Fourth Amendment's prohibition against unreasonable searches. *See United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1978) and cases cited therein.

As the court below correctly noted, the United States Supreme Court, *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), recently has articulated its views with reference to the applicable legal standard in border search situations. In that case, Mr. Justice Rehnquist, writing for the majority, surveyed the relevant law in this area and concluded that

> Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.

431 U.S. at 619, 97 S.Ct. at 1980 (footnote omitted).

■ Accordingly, Nieves, by his decision to cross our national boundary, was deemed to have waived any objection to a routine search of his belongings and effects, because to this extent, society is not prepared to recognize as reasonable any subjective expectation of privacy he might have. *See Asbury, supra*, at 975.

This brings us to Nieves's second and final allegation, namely, that the search of his person went beyond a routine border search and was not supported by probable or reasonable cause. We do not agree. Although this Circuit has not yet squarely been faced with the issue of whether the removal and search of a person's shoes constitutes a "strip search" subject to the "rea-

sonable suspicion" standard,[4] we have recognized that a number of other Circuits have held that the term "personal effects" includes a person's outer clothing as well as the contents of pockets, purse or wallet. *See Asbury, supra,* at 975 n.2. Thus, not every request that a person remove an article of clothing or remove objects from an article of clothing will result in the automatic transformation of a routine search of belongings and effects into a strip search. We also note that several Circuits have held that the removal and search of a person's shoes at a border checkpoint does not amount to a strip search, but rather is an acceptable procedure in a routine border inspection for which no justification is needed beyond the fact that the person involved has just crossed our national boundary.[5]

 We find the reasoning expressed by these Circuits, which analogizes the removal of a shoe to the removal of an outer garment, to be persuasive. We do not believe that the relative degree of embarrassment or indignity that a person is likely to suffer as a result of complying with a request to remove his shoes is sufficient to warrant the imposition of a "reasonable suspicion" requirement as a precondition to such a request in a standard border search context. Accordingly, we hold that the search of Nieves's shoes was an acceptable routine border inspection procedure, and that this search needed no justification beyond that provided by Nieves's decision to cross our national boundary.[6] Of course, once the customs officers discovered that

Nieves's shoes contained cocaine, they had ample probable cause both to place Nieves under arrest and to conduct the subsequent strip search of his person.

### III

 Appellant Figueroa's situation presents a somewhat more difficult case. Essentially, she asserts that because she already had undergone a customs inspection, and no longer was within the customs inspection area, her subsequent detention and search should not have been classified as a valid border search and they therefore should have been held unreasonable, in violation of the Fourth Amendment, if, as she claims, they were not supported by probable cause. We do not agree with Figueroa's contention that the district court erred in treating her detention and search as a valid border search. Further, we hold that, even assuming, arguendo, such an error by the court below, Fiqueroa's detention and search were under the circumstances neither inappropriate nor unsupported by probable cause. Because these contentions raise distinct issues, we discuss each one separately.

We will first address the district court's classification of Figueroa's post-customs detention and search as a valid border search. The court below, in denying Figueroa's suppression motion, relied heavily on the fact that although Figueroa already had been cleared through customs, she was still inside the International Arrivals Building. Previous decisions of this Court, *see, e. g., United*

---

4. In *Asbury, supra,* we adopted the Fifth Circuit's "reasonable suspicion" standard rather than the Ninth Circuit's "real suspicion" standard for application in future border search contexts in this Circuit. *See* 586 F.2d at 976–77.

5. *See United States v. Fitzgibbon,* 576 F.2d 279 (10th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978); *United States v. Chase,* 503 F.2d 571 (9th Cir. 1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975).

6. Even assuming that the search of Nieves's shoes would not be an acceptable procedure in a routine border search, we still would reach the same result. As we noted in *Asbury, supra,* "[i]n each case, reasonableness is deter-

mined by weighing the warranted suspicion of the border official against the offensiveness of the intrusion." 586 F.2d at 976 (footnote omitted). *See also Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

Of the dozen factors we set forth in *Asbury, supra,* 586 F.2d at 976–77, that could be taken into account in determining the issue of reasonableness in particular cases, two—an itinerary suggestive of wrongdoing and inadequate luggage—were present here. Under the circumstances of this case, these factors at least established a degree of reasonable suspicion sufficient to justify the minimally offensive intrusion involved in the removal and search of Nieves's shoes.

*States v. Glaziou*, 402 F.2d 8 (2d Cir. 1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969), as well as of other Circuits, *see, e. g., United States v. Wardlaw*, 576 F.2d 932 (1st Cir. 1978); *United States v. Golden*, 532 F.2d 1244 (9th Cir. 1976), have established the propriety of conducting secondary customs searches on persons who previously have undergone an initial customs inspection, yet who still were within close proximity to the customs inspection area. Indeed, as we stated in *Glaziou, supra*

> The term "border area" in this context, is elastic, see *Murgia v. United States* [285 F.2d 14 (9th Cir. 1960), *cert. denied*, 336 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265 (1961)]; the precise limits of the border area depend on the particular factual situation presented by the case raising the issue. . . . "[B]order area" reasonably includes not only actual land border checkpoints but also the checkpoints at all international ports of entry *and a reasonable extended geographic area in the immediate vicinity of any entry point.*

402 F.2d at 12–13 (emphasis added).

Furthermore, as we also noted in *Glaziou, supra*, principles developed in the analogous "extended border search" cases, although not directly applicable, nonetheless may be analytically helpful in assessing the validity of secondary customs searches.[7] Accordingly, given the facts that Figueroa was still within the confines of the International Arrivals Building, that a relatively short time had elapsed since she had undergone the initial customs inspection, and that the agents had ample grounds to suspect that she might be involved in the same drug smuggling operation as Nieves,[8] we agree with the conclusion of the district court that her subsequent detention and search qualified as a valid border search, and conclude that her suppression motion was properly denied on that ground.

Alternatively, even assuming that the post-customs detention and search of Figueroa was incorrectly held to have been a valid border search, the agents' actions either were appropriate under the circumstances or were supported by probable cause.

As a preliminary matter, we think the agents' initial contact and detention of Figueroa is governed by the "investigative stop" doctrine first formulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which permits law enforcement officers "in appropriate circumstances and in an appropriate manner [to] approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22, 88 S.Ct. at 1880.[9]

On numerous occasions, this Court has outlined the contours of the *Terry* doctrine.

---

7. The factors we identified in *Glaziou, supra*, as relevant to the inquiry concerning the validity of an extended border search included "the distance of the search from the point where goods could be introduced by the suspect into the United States, the time that has elapsed since the suspect had an opportunity to bring in the goods, and the circumstances upon which the officers base their suspicions." 402 F.2d at 14 n.3 (quoting *United States v. McGlone*, 394 F.2d 75, 78 (4th Cir. 1968)).

8. At the time when the agents first contacted and detained appellant Figueroa, they were in possession of the following information: that Figueroa's suitcase appeared identical to the one belonging to Nieves; that Figueroa's suitcase bore a luggage tag identical to the one observed on Nieves's suitcase; that Figueroa was standing, apparently waiting for something or someone, in the area Nieves had identified as the location where the "contact person" was to meet him; and that Figueroa's behavior corresponded exactly with the instructions Nieves was to follow in arranging to be contacted.

Of course, by the time appellant Figueroa was subjected to the more intrusive strip search of her person the agents had discovered the following additional information: that Figueroa had arrived on the same flight from Panama as Nieves; that Figueroa's customs declaration form revealed her address to be the same as Nieves's; and, most crucial, that Nieves had indicated that "the woman" also had cocaine concealed in her shoes.

9. Of course, to justify the "investigative stop," the agents "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion," *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (footnote omitted). Here, we believe that the information known to the agents at the time they initially contacted and detained

*See, e. g., United States v. Ortiz,* 594 F.2d 320 (2d Cir. 1979); *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977); *United States v. Magda,* 547 F.2d 756 (2d Cir. 1976), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1978); *United States v. Santana,* 485 F.2d 365 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974). Indeed, in *Oates, supra,* we determined that the *Terry* doctrine authorized not only investigative stops of suspects, but, also, in appropriate circumstances, the temporary detention of such suspects and their removal to a location more conducive to effective interrogation. *See* 560 F.2d at 56–61. We believe that the action taken by the agents in the present case is virtually indistinguishable from the course of conduct we endorsed in *Oates, supra.*[10]

Finally, we proceed to discuss the justification for the subsequent strip search performed on Figueroa after she had been placed under arrest. It is well established that any reasonable search conducted incident to a lawful arrest would be unobjectionable. *See, e. g., United States v. De-Leon,* 561 F.2d 421 (2d Cir. 1977). Therefore, we first must inquire whether the

agents had probable cause to place Figueroa under arrest—"whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [Figueroa] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). As we previously indicated, we find that the additional information that the agents obtained after accompanying Figueroa back to the customs inspection area amply satisfied the probable cause requirement needed to justify the placing of her under arrest.[11] Further, we find that the search performed on Figueroa incident to her lawful arrest was not conducted in such an offensive manner as would warrant a finding that it was unreasonable, in violation of the Fourth Amendment.

The suppression motions were properly denied. The judgments of the district court are affirmed.

---

Figueroa, *see* note 8 *supra,* constituted such "specific and articulable facts."

**10.** In both *Oates* and the present case, persons suspected of transporting narcotics were contacted initially by the law enforcement officers in a public area of an airport; in both cases the law enforcement officers, for valid reasons, requested the suspects to move to a more private area for further interrogation (in *Oates* the request appears to have been motivated by a concern for the safety of others in the area, because the law enforcement officers had reason to believe that the suspects might be armed; in the present case, the request was made so that a Spanish-speaking officer could be obtained to interrogate Figueroa, who was not conversant in English); and in both cases, there is no evidence that the suspects' compliance with these requests was other than voluntary.

In the present case, Figueroa contends that because the agent who asked her to accompany him back to the customs inspection area later testified that he was "thinking in terms of a custodial situation," the matter had proceeded beyond a mere "investigative stop" and had developed into an actual arrest. We were faced with a similar claim in *Oates,* where we

stated that "the issues involved in determining the propriety of stops, arrests and searches must be resolved by an objective rather than a subjective standard." 560 F.2d at 58 (footnote and citations omitted). Viewing the situation here under an objective standard, we must conclude that Figueroa's detention was in fact a stop and not an arrest. Because there is nothing in the record to indicate that Figueroa's seemingly voluntary decision to accompany the agent back to the customs inspection area was in fact coerced, and because this course of conduct, objectively viewed, cannot be characterized as equivalent to an arrest, we think the situation here is sufficiently distinguishable from the "investigatory seizure" situation involved in the U. S. Supreme Court's recent decision in *Dunaway v. New York,* —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

Finally, we note that in contacting and detaining Figueroa, the agents did not attempt to harass, intimidate or humiliate her in any way. We previously have considered such factors relevant to an examination of the propriety of an investigative stop. *See Magda, supra,* 547 F.2d at 759.

**11.** *See* note 8 *supra.*