**UNITED STATES of America**

v.

**Jack Lee MABIE, Defendant.**

**No. 83 CR 415.**

United States District Court,
E.D. New York.

Feb. 24, 1984.

---

Raymond J. Dearie, U.S. Atty., E.D.N.Y., New York City (Kevin J. O'Brien, Asst. U.S. Atty., New York City, of counsel), for the United States.

Irwin Klein, New York City, for defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This is a motion, pursuant to Fed.R. Crim.P. 12(b)(3), to suppress physical evidence seized from and statements made by the defendant.

### Facts

The credible evidence adduced by the Government at the suppression hearing established the following facts:

On August 24, 1983, at approximately 6:30 p.m., defendant arrived at JFK International Airport aboard Avianca Airlines Flight No. 007 from Cartagena, Colombia. In the Customs area of the airport he was observed by Customs inspectors, who noticed that he walked with a limp. Accordingly, defendant was stopped and asked a series of questions about his trip to Colombia and its purpose. Although defendant appeared to be alone at the airport, he told Customs that he had gone to Colombia on a tour. He also stated that he went to "check things out." As this questioning proceeded, defendant grew increasingly nervous and began to fidget.

Defendant was then asked to collect his luggage and follow Customs inspectors into a private room adjacent to the main Customs area, where a pat-down search of the surface of his clothing and boots was conducted. The Customs inspector who conducted the pat-down, Inspector Lynch, felt an abnormal bulge on the outer side of each boot. Inspector Lynch asked defendant to raise his pant legs enough to clear the tops of his boots. When defendant did so, Inspector Lynch saw white powder wrapped in plastic bulging out of the open zipper of both boots. Inspector Lynch asked defendant to take off his boots. The powder, contained in two packages, was removed and immediately field-tested. The results of the test were positive for cocaine.

Inspector Lynch then arrested defendant, at approximately 7:40 p.m., and read him his *Miranda* rights from a card. When Inspector Lynch asked defendant if he wanted to waive his *Miranda* rights, defendant stated that he did not, and questioning ceased. Inspector Lynch then searched defendant's travel bag in detail. Removal of a false side of the bag revealed additional packages of white powder, which also proved to be cocaine.

During the course of his search of the bag Inspector Lynch asked defendant, in substance, why he had "done it." Defendant responded, in substance, that he had an "old lady" to take care of, as well as numerous bills to pay. This statement occurred approximately five minutes after defendant had told Inspector Lynch that he did not wish to waive his *Miranda* rights. These rights were not repeated to him during this conversation.

DEA agents arrived at the Customs area at approximately 8:00 p.m. and were informed that defendant had been advised of his *Miranda* rights. One of the DEA agents asked defendant if he would like to say anything about the white powder found in his boots and his bag. When defendant responded that he did not want to make a statement, he was asked no further questions.

Defendant was then taken for processing by Inspector Lynch and a DEA agent to the DEA Office in the airport. En route, Inspector Lynch and defendant struck up a

conversation. At one point Inspector Lynch asked defendant, in reference to his earlier statement about his "old lady," if he was taking care of his mother. Defendant responded in substance that he had been married several times and also had a girl friend and family to support. This conversation occurred roughly 15 minutes after defendant had declined to make a statement to the DEA agents.

On the following day, August 25, defendant was escorted to arraignment before United States Magistrate John L. Caden by two DEA agents, neither one of whom had prior contact with defendant or was aware of his prior statements. On the way to court small talk ensued concerning, among other things, defendant's employment. One of the agents then asked defendant, in substance, "why he had done such a dumb thing." Defendant responded, in substance, that he was divorced and also had children, relatives and a girl friend to support. Defendant also stated that "everybody wants money from me." No *Miranda* warnings were given by the agents during this conversation.

### Discussion

Defendant's motion is three-fold. First, he argues that the cocaine found in his boots and travel bag by Customs inspectors must be suppressed as the fruit of a warrantless search which was unsupported by exigent circumstances. Second, he argues that the statements made to Inspector Lynch at JFK must be suppressed as the fruit of the illegal search and seizure and as a violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Third, he argues that the statement made to DEA agents en route to his arraignment must be suppressed as violative of both *Miranda* and his Sixth Amendment right to counsel.

### 1. The Search at JFK

Defendant denies the Government's contention that the "pat-down" conducted by Inspector Lynch at JFK and the subsequent search of defendant's travel bag constituted a valid border search under *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). In that regard, it is important to note that defendant's flight to JFK originated in South America and that the challenged search was performed by a Customs inspector in a private room adjacent to the main Customs area at the terminal.

Searches by Customs officials of passengers arriving in this country on international flights constitute valid border searches, which need not be supported by warrant or probable cause. *United States v. Nieves*, 609 F.2d 642 (2d Cir.1979). Such a passenger, "by his decision to cross our national boundary, [is] deemed to have waived any objection to a routine search of his belongings and effects . . . ." *Id.* at 645.

Even secondary searches of "persons who have previously undergone an initial customs inspection, yet who were still within close proximity to the customs inspection area" have been approved. *Id.* at 647, *citing United States v. Glaziou*, 402 F.2d 8 (2d Cir.1968). Moreover, this Circuit has stated:

> We do not believe that the relative degree of embarrassment or indignity that a person is likely to suffer as a result of complying with a request to remove his shoes is sufficient to warrant the imposition of a "reasonable suspicion" requirement as a precondition to such a request in a standard border search context. Accordingly, we hold that the search of Nieves's shoes was an acceptable routine border inspection procedure, and that this search needed no justification beyond that provided by Nieves's decision to cross our national boundary. Of course, once the customs officers discovered that Nieves's shoes contained cocaine, they had ample probable cause both to place Nieves under arrest and to conduct the subsequent strip search of his person.

*United States v. Nieves, supra,* 609 F.2d at 646 (footnote omitted).

Thus, under *Nieves*, I find that the search of defendants's boots and luggage

by Inspector Lynch and the subsequent seizure of the cocaine did not violate defendant's Fourth Amendment rights. *See also United States v. Grotke*, 702 F.2d 49 (2d Cir.1983). Accordingly, the motion to suppress the cocaine as evidence is denied.

### 2. Statements at JFK

Because I have found that the search and seizure by Inspector Lynch did not violate the Fourth Amendment, I must reject the "poisonous tree" doctrine as a basis for suppression of defendant's statements at JFK. That leaves for consideration defendant's Fifth Amendment argument under *Miranda* which poses the question whether and under what circumstances an arresting officer may resume questioning a defendant who has invoked his right to remain silent.

Considered alone, the language of *Miranda* seems to suggest that invocation of the right to remain silent flatly precludes the resumption of questioning at a later time:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

384 U.S. at 473–74, 86 S.Ct. at 1627–28.

Nine years later, however, in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Court dispelled the notion that *Miranda* had created a *per se* prohibition of further interrogation once the defendant has indicated a desire to remain silent:

> [A] blanket prohibition against the taking of voluntary statements or a perma-

nent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

423 U.S. at 102–03, 96 S.Ct. at 326.

It should be noted that in *Mosley* the second round of questioning began two hours after the initial *Miranda* warnings were given and was preceded by a second set of warnings. This Circuit, however, has insisted upon neither a significant hiatus, nor a second recitation of rights as a condition to renewed interrogation.

In *Wilson v. Henderson*, 584 F.2d 1185, 1188 (2d Cir.1978), a divided panel stated: "[w]e are not of the belief, however, that the crucial factor in determining a Fifth Amendment violation should be the length of time between questioning." In *Wilson,* the defendant indicated that he did not wish to make a statement at the time of his arrest. Nevertheless, he was immediately asked by the arresting officer: "[w]ell, would you care to tell me what you did on July 4th [the day of the crime]?" 584 F.2d at 1187. The defendant responded affirmatively and proceeded to make a false exculpatory statement.

Refusing to order suppression, the Second Circuit reasoned that:

> There is not a hint in the record of the instant case that Wilson's will to resist was overborne by persistent or coercive questioning. To the contrary, Wilson appeared to control the interrogation. We return, therefore, to the observation in *Miranda* that the critical safeguard is the right to cut off questioning, and we conclude that that right was scrupulously honored herein. Accordingly, the peti-

tioner's Fifth Amendment privilege against self incrimination was not violated under the circumstances of this case. 584 F.2d at 1189.

In discussing what it termed the "absence of badgering from relentless interrogators," however, the *Wilson* court focused upon the innocuous nature of the arresting officer's question:

> Cullen's question, "Would you care to tell me what you did on July 4th?" could fairly be construed as an explanation to Wilson that a "statement" need not be a confession and as an attempt to ascertain the scope of Wilson's refusal to make a "statement." It would reasonably be consistent with the officer's experience to believe that a suspect who voluntarily surrenders to the authorities, acknowledges that he understands each of his rights and does not request counsel may well wish to offer an exculpatory statement. Indeed, Justice White in his concurring opinion in *Michigan v. Mosley*, warned against a construction of the Fifth Amendment which would "imprison a man in his privileges" and which would thwart the ability of a suspect to explain a particularly incriminating fact or to supply an alibi that would result in his immediate release. 423 U.S. at 109, 96 S.Ct. at 329, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 280, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

584 F.2d at 1188.

■ It would strain reason to the breaking point, however, to apply that rationale to the question asked of the defendant in the instant case. Having invoked his right to silence and upon being confronted with further evidence of his crime in the form of cocaine taken from his luggage five minutes later, defendant was asked "why did you do it?" or words to that effect. Such a question cannot be construed as "an attempt to ascertain the scope of [defendant's] refusal to make a 'statement.'" Nor can it be viewed as "an explanation to [defendant] that a 'statement' need not be a confession." 584 F.2d at 1188. On the

contrary, the question was instinct with condemnation, an invitation to confess.

The "relentless interrogation" decried in *Wilson* is not the sole method by which a police officer may improperly overcome the defendant's will to resist making a statement after he has previously invoked his right to remain silent. The same purpose may be accomplished, unwittingly or not, by confronting the defendant at the time of his arrest with the physical evidence of his crime and asking him questions that are pregnant with the implication of guilt. Coercion need not be blatant in order to serve its purpose.

Accordingly, defendant's statement in response to Inspector Lynch's question is inadmissible. The subsequent statement made by defendant while being escorted to the airport DEA Office must also be suppressed since it is little more than a clarification of defendant's response to the original, impermissible question propounded by Inspector Lynch minutes earlier.

### 3. Statement En Route to Arraignment

■ The statement which defendant made on the day following his arrest and prior to his arraignment is challenged on both Fifth and Sixth Amendment grounds. The latter may be disposed of quickly.

"Since the Sixth Amendment right to counsel attaches only after the filing of formal charges, [defendant's] incriminating statement, if protected at all, is protected by the Fifth Amendment rather than the Sixth." *United States v. Guido*, 704 F.2d 675, 676 (2d Cir.1983). "Nor would the fact that the questioning ... occurred just prior to arraignment, when it might be anticipated that counsel will be appointed at the arraignment, furnish a basis for excluding the statement." *United States v. Ramirez*, 482 F.2d 807, 815–16 (2d Cir.1973).

■ Addressing next, the defendant's Fifth Amendment claim, it must be remembered that he invoked his right to remain silent on the previous day. Thus, his Fifth Amendment claim "turns on whether his incriminating statement was volunteered or

the product of interrogation." *United States v. Guido, supra,* 704 F.2d at 676.

The question asked by the escorting DEA agents was virtually identical to that propounded by Inspector Lynch at the time of defendant's arrest, and is therefore equally objectionable for the reasons stated above. Moreover, it is beyond cavil that the conversation constituted the type of "express questioning" proscribed by *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Nor, do I find that the defendant's willingness to engage in "small talk" with the escorting agents can support a finding that he intelligently and voluntarily waived his previously-invoked right to remain silent.

Because the statement was the product of what can only be described as resumed interrogation (albeit by different agents) designed to elicit an incriminating response, it must be suppressed.

### Conclusion

Accordingly, defendant's motion to suppress, pursuant to Fed.R.Crim.P. 12(b)(3), is denied with respect to the cocaine and granted with respect to the statements made by defendant and considered herein.

SO ORDERED.