787 A.2d 186 (2001)
346 N.J. Super. 87
STATE of New Jersey, Plaintiff-Respondent,
v.
Vastet GREEN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted May 9, 2001.
Decided July 9, 2001.
*187 Peter A. Garcia, Acting Public Defender, attorney for appellant (Susan Brody, Assistant Deputy Public Defender, of counsel, on the brief).
Donald Campolo, Assistant Attorney General, Acting Essex County Prosecutor, attorney for respondent (Ian S. Clement, Special Deputy Attorney General/Assistant Prosecutor, on the brief).
Before Judges EICHEN, STEINBERG and WEISSBARD.
The opinion of the court was delivered by *188 WEISSBARD, J.A.D.
Defendant appeals his judgment conviction entered on a plea of guilty to possession of cocaine, N.J.S.A. 2C:35-10a(1), and possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5b(1). He was sentenced to five years of imprisonment with a two-year period of parole ineligibility. The plea was entered after the denial, without an evidentiary hearing, of defendant's motion to suppress cocaine seized from his shoes by a United States Customs officer at Newark International Airport on March 22, 1997 as he arrived from Jamaica. On appeal defendant raises the sole contention that the trial court erred in denying the motion, at least without the benefit of a full evidentiary hearing. For the reasons which follow, we affirm.
The State took the position that an evidentiary hearing was not required since there were no material facts in dispute. R. 3:5-7(c); State v. Kadonsky, 288 N.J.Super. 41, 45-46, 671 A. 2d 1064 (App. Div.), certif. denied, 144 N.J. 589, 677 A.2d 761 (1996). The rule provides that the filing of a motion by a defendant asserting that evidence to be used against him was seized in a warrantless search triggers a requirement that "the State shall, within fifteen days of the filing of the motion, file a brief, including a statement of facts as it alleges them to be, and the movant shall file a brief and counter statement of facts no later than three days before the hearing." It is only when the defendant's counter statement places material facts in dispute that an evidentiary hearing is required. State v. Hewins, 166 N.J.Super. 210, 213-15, 399 A.2d 343 (Law Div. 1979), aff'd, 178 N.J.Super. 360, 429 A.2d 367 (App.Div.1981). The mere allegation of a warrantless search, with the attendant burden of proof on the State to justify same, does not place material issues in dispute, nor does defendant's assertion that he denies the truth of the State's allegations. Id. at 214, 399 A.2d 343.
In this case the substance of the rule, although not the precise form, was complied with by the State's proffer of a two-page police report dated March 23, 1999 from the Port Authority of New York and New Jersey setting forth the circumstances under which the drugs were seized on March 22, 1999. The Assistant Prosecutor summarized the report as follows:
Judge, according to the report a U.S. Custom inspector by the name of Robert McNally selected Mr. Green on the day in question for an enforcement exam. He was arriving from Jamaica, which is a known drug source country. His airline ticket had been paid for in cash the same day that it was purchased. He had no checked bags. At that time he stated he waswould only be here for four days. He had made numerous trips in the last three years to this country; however, this was his first trip to Newark.
During the interview he appeared to be extremely nervous. It's noted here he had a trembling voice, he avoided eye contact with the custom officer, a pat down was conducted, and they noticed during the pat down that his shoes appeared to be unusually heavy. When they probed further, they found a white powdery substance in his shoes made out like shoe pads or inserts and it was five hundred 79 grams of what appeared to be cocaine. Those are the facts set out by the U.S. Customs Office through Police Officer Michael Milne who actually made the arrest after Customs detained Mr. Green and found cocaine in his shoes.
Immediately thereafter, apparently in an effort to create disputed issues of material fact, defendant testified under oath. As we have noted, testimony was not required *189 by the rule; a counter statement of facts contained in a brief would have been sufficient. Nevertheless, defendant's version of the events of March 22, 1997 was as follows.
Defendant testified that he arrived at Newark International Airport at 9:47 p.m. Upon deplaning, he went to immigration where they checked his documents and stamped his passport. After immigration, defendant proceeded to customs where a U.S. Customs official approached him.[1] The inspector then asked defendant if he could search his carry-on bag. Defendant proceeded to place the bag at his feet, whereupon the customs agent patted the defendant down. The customs official then asked for defendant's airline ticket and passport, which defendant gave to him. Thereafter, the customs agent proceeded to pick up the bag and a box containing duty-free rum that defendant was carrying and asked the defendant to come over to the customs desk with him. The customs agent searched the bag and the box, finding nothing of an illegal nature. Following the search, the customs inspector asked defendant a series of questions relating to his present trip to Newark, including where he was planning on staying in New Jersey, whether he had family in the area, and how long he planned on staying in the area. Thereafter, the customs official asked defendant to proceed into a private room where he ordered defendant to unbutton his shirt and pants and remove his shoes. According to defendant, he removed his shoes and placed them on a table, started to unbutton his shirt and pulled the belt from his pants. At that point the customs official picked up the shoes, left the room for a moment and upon returning twice "bent" the shoes in front of defendant. The customs agent then inquired of defendant why the shoes were "unusually heavy" and asked what was inside the shoes. Defendant responded that the shoes were brand new and that there was nothing in them. The customs official proceeded to puncture the sole of one or both shoes, revealing the cocaine.[2] It does not appear that defendant ever disrobed before the cocaine was discovered.
After hearing argument, the court reserved decision and on September 20, 1999, issued an oral ruling denying defendant's motion. The court stated that
in the context of the line of cases dealing with the conduct of stops, pat-downs, examinations of people, luggage and clothing by custom personnel and factors attendant to those activities, I cannot find and do not find in this case that the defendant here presents any material facts justifying a hearing on the suppression of the evidence seized, and for those reasons the defendants' application is denied.
As we have noted, defendant then entered his guilty plea, preserving the right to appeal the denial of his motion to suppress. R. 3:5-7(d). In order to determine whether the trial court was correct, we too must examine the law applicable to *190 so-called "border searches,"[3] which has not previously been the subject of any reported decision in our State, a fact which is somewhat surprising given the presence here of Newark Airport, a major point of entry into the continental United States.[4]
In United States v. Ramsey, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617, 626 (1977), the Supreme Court said that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." As the Court pointed out, the first customs statute, which granted customs officials broad authority to enter and search ships or vessels in which they "have reason to suspect" goods subject to duty were concealed, was passed two months before and by the same Congress that proposed the Bill of Rights including the Fourth Amendment.[5] The Court had noted this history as far back as Boyd v. United States, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746 (1886), where it said that "the same Congress which proposed for adoption the original amendments to the Constitution ... did not regard searches and seizures of this kind as `unreasonable' and they are not embraced within the prohibition of the amendment." Thus, in Ramsey, the Court held:
Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be reasonable by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless `reasonable' has a history as old as the Fourth Amendment itself.

[431 U.S. at 619, 97 S.Ct. at 1980, 52 L.Ed.2d at 628.]
The statutory authority of customs officers to conduct searches at the borders is derived from two enactments. 19 U.S.C. § 1582 provides that "all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers and agents of the Government under [Treasury Department] regulations."[6] Such officers "may stop, search, and examine ... any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law...." 19 U.S.C. § 482. As a result, "[r]outine searches of *191 the persons and effects of entrants [are] not subject to any requirement of reasonable suspicion, probable cause or warrant..." United States v. Montoya de Hernandez, 473 U.S. 531, 537, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381, 389 (1985). With respect to such "routine searches," there need not be "any suspicion of illegality directed to the particular person or thing to be searched." United States v. Odland, 502 F.2d 148, 151 (7th Cir.), cert. denied, 419 U.S. 1088, 95 S.Ct. 679, 42 L.Ed.2d 680 (1974); see also, United States v. Braks, 842 F.2d 509, 514 (1st Cir.1988) (standard is "no suspicion"); United States v. Himmelwright, supra, 551 F.2d at 994 ("such stops and searches need not be grounded in any particularized and articulable suspicion").
Thus, although the border search is not per se exempted from the Fourth Amendment requirement of reasonableness, United States v. Sandler, 644 F.2d 1163, 1164 (5th Cir.1981), the routine border search has been determined to be reasonable. United States v. Ramsey, supra. This much said, the question is what constitutes a routine border search as opposed to one that is not routine. We believe the court in United States v. Braks, supra, properly explained the test required to make the routine/non-routine determination:
The degree of invasiveness or intrusiveness associated with any particular type of search determines whether or not that search qualifies as routine.
[842 F.2d at 511]
This follows from the fact that reasonableness in the Fourth Amendment context "always depends upon a balance between, on the one hand, the level of official intrusion into individual privacy and, on the other hand, the public interest to be served by such an intrusion." United States v. Himmelwright, supra, 551 F.2d at 994. In this area, as in others, "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." United States v. Villamonte-Marquez, 462 U.S. 579, 588, 103 S.Ct. 2573, 2578, 77 L.Ed.2d 22, 30 (1983) (quoting Delaware v. Prouse, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667-68 (1979)). And "to determine the level of intrusiveness of a search, we must focus on the indignity of the search ... extensiveness alone does not control." United States v. Vega-Barvo, 729 F.2d 1341, 1345 (11th Cir.), cert. denied, 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984).
From the multitude of factual scenarios addressed by the courts, we distill the following parameters of a routine border search. The initial stop and detention of an individual for questioning is permissible. United States v. Oyekan, 786 F.2d 832 (8th Cir.1986). Searches of a traveler's luggage, United States v. Ezeiruaku, 936 F.2d 136, 140-41 (3rd Cir.1991), and personal effects, including the contents of a purse, wallet or pockets, United States v. Himmelwright, supra; Henderson v. United States, 390 F.2d 805, 808 (9th Cir.1967), are deemed routine. Similarly, a request to remove outer garments, such as a coat or jacket for the purpose of a search is likewise considered routine. United States v. Sandler, supra, 644 F.2d at 1169; see United States v. Asbury, 586 F.2d 973-74 (2nd Cir.1978).
It has also been held that a pat-down, commonly referred to as a frisk, is within the permissible limits of a routine border search. United States v. Sandler, supra; United States v. Oyekan, supra, 786 F.2d at 835; United States v. Vega-Barvo, supra, 729 F.2d at 1345; Davis v. State, 133 Md.App. 260, 754 A.2d 1111 (2000). The *192 assumption underlying these cases is that a frisk is not unduly intrusive and "involves relatively little indignity or embarrassment... It is neither painful nor dangerous. Whatever the stigma attached to a pat-down in other contexts during a border inspection it is no worse than having a stranger rummage through one's baggage, a practice which is clearly acceptable." United States v. Sandler, supra, 644 F.2d at 1166. However, that view is not unanimous.
In United States v. Dorsey, 641 F.2d 1213, 1217 (7th Cir.1981), the court held that "the intrusiveness on privacy and indignities involved in a pat-down search exceed those of a search of the contents of a purse, wallet or of a request to empty pockets." As a result, the court held that "some level of suspicion" is required for a pat-down; a suspicion "based on objective factors and judged in light of the experience of the customs agents." Id. at 1219. In reaching that conclusion, the Seventh Circuit employs a balancing test. "What is required to be balanced in any particular case is the level of suspicion of the agent against the level of indignity perpetrated upon the traveler." Ibid. (quoting from United States v. Brown, 499 F.2d 829, 833 (7th Cir.), cert. denied, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974)); see also United States v. Grayson, 597 F.2d 1225, 1228 (9th Cir.), cert. denied, 444 U.S. 875, 100 S.Ct. 157, 62 L.Ed.2d 102 (1979); United States v. Klein, 592 F.2d 909, 912 (5th Cir.1979); United States v. Sandler, supra, 644 F.2d at 1169-73, (Hatchett, J. dissenting). In People v. Luna, 73 N.Y.2d 173, 538 N.Y.S.2d 765, 535 N.E.2d 1305 (1989), New York's highest court established a minimal level of suspicion test for pat-downs, albeit not without strong disagreement by one member of the court, 538 N.Y.S.2d 765, 535 N.E.2d at 1309-10 (Bellacosa, J. concurring), and criticism in United States v. Charleus, 871 F.2d 265, 268 n. 2 (2nd Cir.1989).
We agree with those courts that have judged a pat-down to be within the concept of a routine border search, requiring no particularized suspicion. United States v. Montoya de Hernandez, supra, is instructive. That case involved a rectal search, leading to the discovery of eighty-eight balloons filled with cocaine. The Court held that "detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all of the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal," 473 U.S. at 541, 105 S.Ct. at 3310, 87 L.Ed.2d at 391. In the context of that holding, we deem significant the following observation by Justice Brennan in his dissent:
Travelers at the national border are routinely subjected to questioning, pat-downs, and thorough searches of their belongings. These measures, which involve relatively limited invasions of privacy and which typically are conducted on all incoming travelers, do not violate the Fourth Amendment ...

[Id. at 551, 105 S.Ct. at 3315, 87 L.Ed.2d at 397]
Most of the cases, cited above, which consider pat-downs to be non-routine searches requiring some level of suspicion, predate Montoya de Hernandez. While the issue we consider here was not directly before the Court in that case, we believe the opinion, fairly read, precludes any likelihood that the Supreme Court would consider a pat-down other than part of a routine border search. Justice Brennan's statement, while not a holding, strongly reinforces our view.
In addition, the creation of a standard denominated "some level of suspicion," which apparently lies somewhere between reasonable suspicion and no suspicion, is *193 unworkable and not likely to be helpful to customs officials in regulating their conduct in this sensitive area. As the court suggested in Montoya de Hernandez, the creation of such a third verbal standard in addition to reasonable suspicion and probable cause is neither necessary nor helpful; "subtle verbal gradations may obscure rather than elucidate the meaning of [the Fourth Amendment]." 473 U.S. at 541, 105 S.Ct. at 3309, 87 L.Ed.2d at 391. While not denigrating the intrusion on privacy entailed by a pat-down, we join those courts that consider such a search to be routine insofar as a border search is concerned.
If a search is deemed to be non-routine reasonable suspicion is required. United States v. Braks, supra, 842 F.2d at 514,; United States v. Smith, 557 F.2d 1206, 1208 (5th Cir.1977), cert. denied, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978).
Reasonable suspicion is a concept familiar to our search and seizure jurisprudence. It requires a "particularized, objective and articulable showing." United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981); State v. Arthur, 149 N.J. 1, 8, 691 A.2d 808 (1997); State v. Maryland, 167 N.J. 471, 771 A.2d 1220 (2001); State v. Love, 338 N.J.Super. 504, 507-08, 770 A.2d 719 (App. Div.2001). In the context of a border search, United States v. Asbury, supra, 586 F.2d at 976-77, set out a useful list of factors, distilled from many cases, that have been utilized by courts in determining whether reasonable suspicion has been established. We need not list all of the factors but they include such things as excessive nervousness, unusual conduct, loose fitting or bulky clothing, an itinerary showing brief stops in known drug source countries, lack of employment, inadequate or unusual luggage, and evasive or contradictory answers. These factors, and others listed, are "not exhaustive, they provide useful guideposts in analyzing the myriad factual variations customs officials may encounter," United States v. Oyekan, supra, 786 F.2d at 837 n. 8. See also United States v. Diaz, supra, 503 F.2d at 1026 n. 1 (noting that courts have generally relied upon a combination of the Asbury factors rather than any one of them standing alone).
In this case, however, we need not determine whether the information available to the customs officer before defendant removed his shoes amounted to reasonable suspicion,[7] since every court considering the question has found a search of shoes or boots to be part of a routine border search, requiring no articulable suspicion at all. United States v. *194 Grotke, 702 F.2d 49 (2nd Cir.1983); United States v. Fitzgibbon, 576 F.2d 279 (10th Cir.), cert. denied, 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978); United States v. Ramos-Saenz, 36 F.3d 59 (9th Cir.1994); United States v. Chase, supra; United States v. Nieves, 609 F.2d 642 (2nd Cir.1979), cert. denied, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980); Segree v. State, 186 Ga.App. 489, 367 S.E.2d 882 (1988). As the court noted in Nieves, a removal of shoes is "minimally intrusive" Id. at 646. Removing shoes "is surely not a `strip'. Rather, it is like one removing an overcoat or a suit jacketrelatively innocuous." United States v. Chase, supra, 503 F.2d at 574. We accept this reasoning. Since the request of defendant to remove his shoes was only minimally intrusive, the examination of the shoes is deemed part of a routine border search requiring no degree of suspicion.
After the shoe was removed, the customs agent, even according to defendant's version of the events, determined that the shoes were "unusually heavy." As a result, he punctured the sole of one shoe with either a pin or a knife, revealing the presence of cocaine. As a result, the other shoe was probed, also revealing cocaine. In United States v. Nieves, supra, the court approved a similar shoe puncture as part of a routine border search. But see LaFave, supra, § 10.5(a), p. 534 n. 2 (critical of Nieves holding that drilling hole in shoe was part of a routine search). This case and Nieves are far removed from United States v. Rivas, 157 F.3d 364 (5th Cir.1998) and United States v. Robles, 45 F.3d 1 (1st Cir.), cert. denied, 514 U.S. 1043, 115 S.Ct. 1416, 131 L.Ed.2d 300 (1995). In Rivas the court held that drilling into the frame of a trailer crossing the border from Mexico was not a routine search thereby requiring a reasonable degree of suspicion. In Robles the court had determined that drilling into a closed, metal cylinder which had been removed from a crate entering the country from Colombia was likewise not a routine border search. Both of those searches were clearly far more invasive, required more force and were much more destructive than the pinhole made in defendant's shoe. In United States v. Caro, 637 F.2d 869 (2nd Cir.1981), once Customs inspectors felt unusual ridges along the sides of a suitcase, observed the sides to be unusually thick and heavy, and smelled fresh glue, it was permissible to puncture a hole in the suitcase, leading to the discovery of counterfeit money. In People v. Vasquez, 168 A.D.2d 524, 562 N.Y.S.2d 762 (1990), appeal den., 569 N.Y.S.2d 944, 572 N.E.2d 627 (1991), the court found that puncturing two unusually heavy aerosol cans in defendant's luggage was a reasonable border search.
In any event, we need not decide whether the puncture of the shoe was routine, since we would still find it lawful because the agent at that point had a reasonable suspicion that contraband might be concealed in the shoes based on their unusual weight.[8]See Segree v. State, supra, (one shoe had unusual stitching and seemed unusually thick, upon examination the heel seemed soft; probe inserted in a shoe revealed drugs; search held routine.); I.M. v. State, 400 So.2d 826 (Fla.App.1981) (shoes stiff, did not bend as defendant walked; hole drilled in a shoe revealed cocaine; reasonable suspicion test met.) As a result, we conclude that the search of defendant's shoe and the resulting seizure of cocaine were not in violation of the Fourth Amendment since it resulted from a routine border search, or, if not routine, was based on reasonable suspicion arising from the unusual weight of defendant's *195 shoes. Since the shoes could have been searched in the public area concurrent with the examination of defendant's other personal effects, it is of no moment that the shoes were examined after defendant had been removed to the private room.[9]
Thus, even accepting defendant's version of the circumstances surrounding the removal of his shoes and the discovery of the contraband, the search was lawful. As a result, there was no dispute as to the material facts and a full evidentiary hearing was not necessary. However, we add that if reasonable suspicion had been an issue an evidentiary hearing would have been necessary. Absent a stipulation, the customs officer's report cannot serve as a substitute for testimony, subject to cross-examination. Indeed, in this case the officer might have either confirmed or disputed defendant's version of the facts.
Finally, we observe that this case has been decided solely upon principles of federal Fourth Amendment jurisprudence, whether expounded by state or federal courts. In an area of law involving actions by federal officials based upon federal statutes, we see no basis to invoke our state constitution, even though these searches may impact on the privacy rights of New Jersey citizens. In State v. Mollica, 114 N.J. 329, 358, 554 A.2d 1315 (1989), the Court said:
We further hold that our state-constitutional protections against unreasonable search and seizures do not govern the legality of actions of federal officers with respect to their search and seizure of evidence, provided that their conduct is pursuant to federal authority and consistent with applicable federal law, and provided further they have acted independently and without the cooperation or assistance of our own state officers with respect to the seizure of the evidence.
Other state courts have taken a similar position. Aycock v. State, 863 S.W.2d 183, 186 (Tex.App.1993); People v. Superior Court (Randall), 33 Cal.App. 3d 523, 527, 109 Cal.Rptr. 143 (1973); State v. Coburn, 165 Vt. 318, 683 A.2d 1343, 1346-47 (1996) (collecting cases); People v. Luna, 73 N.Y.2d 173, 538 N.Y.S.2d 765, 535 N.E.2d 1305, 1308-09 (1989).
Affirmed.
NOTES
[1] Defendant stated that at the time he was approached he was unaware that the individual was in fact a U.S. Customs inspector. However, he did testify that the individual was wearing a blue uniform.
[2] The record is not entirely clear as to the exact method the officer employed to puncture the shoe or shoes. At one point, defendant testified that the officer took a "pin" from his pocket and "bore the sole of the shoe." Later, he testified that the officer "took a knife from his pocket and dug into the sole of the shoe." We do not consider this difference to be of significance in our disposition.
[3] A search of passengers arriving directly at an airport, such as Newark, from an origination point outside of the United States, is considered "the functional equivalent of a border search." Almeida-Sanchez v. United States, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596, 602-03 (1973); United States v. Himmelwright, 551 F.2d 991, 993 (5th Cir.), cert. denied, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); United States v. Johnson, 991 F.2d 1287, 1289 (7th Cir.1993).
[4] The likeliest explanation is that most drug seizures at Newark Airport or by customs officials at other international points of entry in New Jersey result in federal prosecutions. Indeed, we are informed that federal authorities declined prosecution in this case.
[5] That same customs statute, however, did require a warrant, issued on "cause to suspect," before entering any "dwelling house, store, building or other place."
[6] 19 C.F.R. § 162.6 provides, in part, that "all persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a customs officer."
[7] We allude to facts such as arrival from a known source country, ticket paid for in cash on the same day, no checked luggage, nervousness, a first trip to the Newark area. These are facts which could only be placed in context by an experienced Customs agent. To the extent that those facts may be claimed to constitute a "smuggling profile," we note that in the end it is not the profile "itself which is crucial. Rather, customs agents and courts must look at the facts in a given situation ... and determine whether they are truly an indication of possible smuggling." United States v. Smith, supra, 557 F.2d at 1209 n. 4. See also United States v. Himmelwright, supra, 551 F.2d at 995. In that regard, we are constrained to point out that the trial court's reliance on United States v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), was somewhat misplaced inasmuch as that case involved seizure of drugs from a passenger on a domestic flight. The border search doctrine is inapplicable in such circumstances; however, the Court's general discussion as to the meaning of reasonable suspicion presumably is just as applicable to international arrivals as it is to domestic travelers. Reasonable suspicion is only a single standard, whether applied in the context of a border search or an investigatory stop on the street. What may constitute reasonable suspicion in one or the other situation may be expected to vary widely.
[8] As noted, a total of 579 grams of cocaine, which equates to over one pound, was found in the shoes, clearly supporting the evidence that the shoes were "unusually heavy."
[9] Neither before the trial court nor in his brief on this appeal has defendant claimed that he was subjected to an unlawful strip search, apart from the examination of his shoes. As a result, we need not decide in this case, and therefore reserve for another day whether defendant was in fact subjected to a strip search, as to which reasonable suspicion is clearly the governing standard, see, e.g., United States v. Himmelwright, supra, 551 F.2d at 995; United States v. Guadalupe-Garza, 421 F.2d 876, 879 (9th Cir.1970); United States v. Diaz, 503 F.2d 1025, 1026-27 (3d Cir.1974).