NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0850-18T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

TYWAUN S. HEDGESPETH, a/k/a
TYWAUNE HEDGESPETH,
TYWUAN HEDGESPETH,
TYWAUN HEDGSPETH, and
TAVON JAMES,

    Defendant-Appellant.

_____

Argued telephonically April 1, 2020 –
Decided August 3, 2020

Before Judges Whipple, Gooden Brown, and Mawla.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Indictment Nos. 16-07-
2215 and 16-07-2216.

Whitney Faith Flanagan, Assistant Deputy Public
Defender, argued the cause for appellant (Joseph E.
Krakora, Public Defender, attorney; Whitney Faith
Flanagan, of counsel and on the briefs).

Lucille M. Rosano, Special Deputy Attorney General/
Acting Assistant Prosecutor, argued the cause for
respondent (Theodore N. Stephens II, Acting Essex

County Prosecutor, attorney; Lucille M. Rosano, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a jury trial, defendant was convicted of third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-l0(a); and second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b). He subsequently pled guilty to second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1). The convictions stemmed from officers observing the butt of a handgun in defendant's waistband when he urinated in an alleyway, as a result of which they searched him and recovered the gun. During the ensuing search incident to his arrest, the officers also found cocaine on defendant's person. Defendant's pre-trial motion to suppress the evidence seized was denied.

On December 1, 2017, defendant was sentenced to an aggregate term of eight years' imprisonment with a five-year period of parole ineligibility. He now appeals from the conforming judgment of conviction, raising the following points for our consideration:

> POINT I
>
> THE ERRONEOUS ADMISSION OF [DEFENDANT]'S TWELVE-YEAR-OLD PRIOR

CONVICTIONS FOR THIRD[-]DEGREE OFFENSES REQUIRES REVERSAL.

POINT II

THE CONVICTION SHOULD BE REVERSED BECAUSE THE TRIAL COURT FAILED TO ESTABLISH THAT JUROR RACIAL BIAS DID NOT PREJUDICE DELIBERATIONS.

POINT III

THE ADMISSION OF AN AFFIDAVIT SIGNED BY A NON-TESTIFYING POLICE OFFICER VIOLATED THE RULES OF EVIDENCE AND THE CONFRONTATION CLAUSE OF THE NEW JERSEY AND FEDERAL CONSTITUTIONS.

POINT IV

THE MOTION COURT ERRED IN DENYING SUPPRESSION WITHOUT A HEARING WHEN THERE WERE MATERIAL FACTUAL [DIFFERENCES] BETWEEN THE STATE AND DEFENSE VERSIONS OF THE EVENTS LEADING TO [DEFENDANT]'S ARREST AND SEARCH.

POINT V

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DENIED DEFENDANT A FAIR TRIAL. (NOT RAISED BELOW).

Having considered the arguments and applicable law, we affirm.

I.

We glean these facts from the trial record. At approximately 12:00 p.m. on April 21, 2016, while conducting visual surveillance in the area of 310 South 14th Avenue in Newark, "a mixture of residential homes" and "commercial establishments," Detectives Ozzie Ryals and Ricardo Rickards of the Essex County Sheriff's Narcotics Bureau observed "four to six unidentified [B]lack males . . . loitering and lingering" in the area. Ryals testified they were conducting surveillance because they "had received numerous complaints from concerned citizens about narcotic[s] activity at that particular location." Subsequently, the unidentified individuals were joined by an individual later identified as defendant. When defendant "urinat[ed] on the wall" in "an alleyway . . . between . . . two buildings," and "was fixing himself and adjusting his clothes," the officers observed what they "thought [was] the butt of a gun" located in the "waistband of [defendant's] pants."

Ryals communicated his observations to back-up officers in the area, including a description of defendant's "approximate height[,] . . . weight," and "clothing." At approximately 2:00 p.m., at least nine detectives, including Detectives Angel Colon and Jimmy Bradley, responded to the area. Upon approaching defendant and identifying himself as a law enforcement officer, Bradley "grabbed . . . [d]efendant, [and] took him to the ground face down," at

which point both Bradley and Colon observed a gun in "the rear of [defendant's] waistband."

After Colon "recovered the weapon," identified as "a Hi-Point .45 caliber handgun," another detective "read . . . [d]efendant his rights and placed him under arrest." A search of defendant's person incident to his arrest uncovered fourteen "small Ziploc bags" of suspected cocaine in defendant's "front waistband." Later testing by a New Jersey State Police (NJSP) forensic scientist confirmed that the substance recovered from defendant was cocaine, and ballistics testing by a detective confirmed that the handgun was operable. The handgun, as well as the magazine and nine rounds of ammunition recovered from it, were also processed for fingerprints by a crime scene investigator (CSI) with negative results.

During the three-day trial conducted from August 8 to 10, 2017, in addition to Ryals, Colon, the forensic scientist, the ballistics detective, and the CSI testifying for the State,[1] the Essex County Superior Court Criminal Division Manager authenticated "a certification of no gun permit," which attested to the fact that her office "searched [the county's] systems" and "found

---

[1] An Essex County Sheriff's Officer assigned to the jail also testified for the State, and confirmed that defendant's clothing at the time of his arrest was "inventoried as part of the processing procedures . . . at the jail," and "subsequently turned over to the [Essex County Prosecutor's Office (ECPO)]."

A-0850-18T3

no record [of] gun permits for [defendant]." Additionally, Detective John Cosgrove, assigned to the Trial Section of the ECPO, authenticated an "affidavit" prepared by NJSP Detective Brett Bloom, certifying that the NJSP performed a record check and determined defendant "[did] not have a permit to carry a firearm on record with the State."

Cosgrove explained in detail the procedure for obtaining record checks from the NJSP and testified he had requested approximately one thousand similar record checks during his career. Cosgrove also stated that although he did "not know which particular trooper did the search," the affidavit in this case was requested by an investigative aide in his unit. Further, Cosgrove explained that the difference between the NJSP affidavit and the county affidavit was the former "searche[d] the State database," while the latter only "search[ed] the County database."

After the State rested, defendant's motion for a judgment of acquittal, R. 3:18-1, was denied by the trial judge, as was defendant's objection to admitting his prior convictions for impeachment purposes if he elected to testify pursuant to State v. Sands, 76 N.J. 127 (1978), and State v. Brunson, 132 N.J. 377 (1993). Thereafter, defendant did not testify or present any witnesses on his own behalf, but, through cross-examination, challenged the State's version of events by, among other things, pointing out that there were no

contemporaneous central dispatch recordings referring to a man with a gun to corroborate the detectives' account.[2] After the jury returned the guilty verdict, defendant entered a negotiated guilty plea to the certain persons charge stemming from the same incident but charged in a separate indictment. This appeal followed.

## II.

In Point I, defendant argues the judge "mistakenly ruled that the prosecutor could use his prior convictions to impeach him" if he elected to testify by erroneously using "the date that [defendant] completed probation," instead of "the date that [he] was convicted of the prior offense," as "the triggering date for the remoteness determination." According to defendant, "[t]his was an incorrect interpretation of the rule, . . . infringed [defendant's] due process right to testify and deprived him of a fair trial."

At the Sands/Brunson hearing, pursuant to N.J.R.E. 609, the State moved to introduce for impeachment purposes defendant's two prior drug-related

---

[2] Ryals testified there were three different ways to communicate with other officers, "recorded" radio calls on the central dispatch channel, unrecorded calls on a "direct" channel that only "detectives assigned to the Narcotic[s] Unit" could hear, and "cellphone" calls between the detectives if there was "too much radio chatter." According to Ryals, because "both [he and Rickards] were relaying information" to the back-up officers simultaneously, one of them "us[ed] one channel," and "the other . . . us[ed] the other [channel]."

convictions, a 2001 third-degree conviction for which defendant was sentenced to a three-year term of imprisonment with a one-year parole disqualifier,[3] and a 2005 third-degree conviction for which defendant was sentenced to four years' probation. The State argued that the 2005 conviction was "not remote" because the probationary disposition "ended in 2009 which [was] less than ten years ago," and the 2001 conviction was admissible based on the 2005 conviction showing a continuing course of criminal conduct. Defendant objected, arguing that the convictions were "so remote" that there was "no reason for [defendant] to be prejudiced by something that he did more than [twelve] years ago."

The judge accepted the State's argument and admitted the prior convictions for impeachment purposes, reasoning that they were not "too remote[] as there ha[d] been a continuing course of conduct." See Sands, 76 N.J. at 145 ("If a person has been convicted of a series of crimes through the years, then conviction of the earliest crime, although committed many years before, as well as intervening convictions, should be admissible."). However, the judge determined that the prior convictions "should be sanitized" since they were also drug related charges. See Brunson, 132 N.J. at 391 (holding

_____

[3] The 2001 conviction encompassed two different third-degree drug offenses charged in two separate accusations, for which defendant received an aggregate three-year term of imprisonment with a one-year parole disqualifier.

that in cases in which a testifying defendant's prior conviction "is the same or similar to the offense charged, the State may introduce evidence of the defendant's prior conviction limited to the degree of the crime and the date of the offense but excluding any evidence of the specific crime of which defendant was convicted.").

"[W]hether a prior conviction may be admitted into evidence against a criminal defendant rests within the sound discretion of the trial judge," Sands, 76 N.J. at 144, "whose discretion 'is a broad one.'" State v. Murphy, 412 N.J. Super. 553, 564 (App. Div. 2010) (quoting Sands, 76 N.J. at 144). "However, we do not defer to a ruling that is based on a mistaken interpretation of an evidence rule, or that misapplies the rule." State v. R.J.M., 453 N.J. Super. 261, 266 (App. Div. 2018).

"Under N.J.R.E. 609, there are different standards for admissibility of a prior criminal conviction for impeachment purposes, depending on whether 'more than ten years have passed' since the defendant's conviction 'or release from confinement for it, whichever is later.'" Id. at 263-64, 267 (quoting N.J.R.E. 609(b)(1)). "Pursuant to N.J.R.E. 609(a), a defendant's prior criminal conviction is admissible for impeachment purposes, unless the defense establishes, pursuant to N.J.R.E. 403, that its admission will be substantially more prejudicial than probative." Id. at 266; see N.J.R.E. 609(a). "However,

N.J.R.E. 609(b)(1) creates a presumption that a conviction more remote than ten years is inadmissible for impeachment purposes, unless the State carries the burden of proving 'that its probative value outweighs its prejudicial effect.'" R.J.M., 453 N.J. Super. at 266-67 (quoting N.J.R.E. 609(b)(1)).

Specifically, pursuant to N.J.R.E. 609(b)(1),

> [i]f, on the date the trial begins, more than ten years have passed since the witness'[s] conviction for a crime or release from confinement for it, whichever is later, then evidence of the conviction is admissible only if the court determines that its probative value outweighs its prejudicial effect, with the proponent of that evidence having the burden of proof.

In making that determination, pursuant to N.J.R.E. 609(b)(2), "the court may consider"

> (i) whether there are intervening convictions for crimes or offenses, and if so, the number, nature, and seriousness of those crimes or offenses,
>
> (ii) whether the conviction involved a crime of dishonesty, lack of veracity or fraud,
>
> (iii) how remote the conviction is in time,
>
> (iv) the seriousness of the crime.
>
> [N.J.R.E. 609(b)(2)(i) to (iv).]

"However, making findings as to those four factors is not enough. The court must then engage in the weighing process under (b)(1), to determine whether the State has carried its burden of proving that evidence of the remote

conviction would not be more prejudicial than probative." R.J.M., 453 N.J. Super. at 270 (citing N.J.R.E. 609(b)(1)). Thus, N.J.R.E. 609(b)(1) encompasses a more stringent admissibility standard, when more than ten years have passed since the "conviction" or the defendant's "release from confinement for it," than N.J.R.E. 609(a), applicable when ten years or less have passed.

Because "confinement" is not defined in the rule, whether discharge from probation constitutes "release from confinement" for the purpose of the ten-year time limit under N.J.R.E. 609(b)(1) is an issue of first impression in this State. "We interpret an evidence rule, as we would a statute, by first looking at its plain language." R.J.M., 453 N.J. Super. at 267 (quoting State ex rel. J.A., 195 N.J. 324, 338 (2008)). "We give 'the terms used . . . their ordinary and accepted meaning,' and we construe the words in the context in which they appear." Ibid. (quoting State v. Shelley, 205 N.J. 320, 323 (2011)); see also N.J.S.A. 1:1-1; State v. Regis, 208 N.J. 439, 447 (2011).

"Where the meaning is evident from the plain language, we need not look further in interpreting the rule." R.J.M., 453 N.J. Super. at 269; see also State v. Rangel, 213 N.J. 500, 509 (2013) ("If giving an enactment's words their commonsense and ordinary meaning reveals legislative intent, our mission is complete."); DiProspero v. Penn, 183 N.J. 477, 492 (2005) ("The

Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language."). However, if the "words 'admit[] to more than one reasonable interpretation,' we consider external sources in attempting to 'ascertain . . . intent.'" State v. Clarity, 454 N.J. Super. 603, 607 (App. Div. 2018) (first alteration in original) (quoting State v. Reiner, 180 N.J. 307, 311 (2004)).

In Clarity, on which defendant heavily relies, we considered whether a "probationary term imposed for [a defendant's] last prior crime [w]as the equivalent of 'confinement'" under N.J.S.A. 2C:44-3(a), permitting "imposition of an extended prison term when the defendant was convicted of at least two separate prior crimes but only if 'the latest' of those crimes was committed or the defendant's 'last release from confinement' occurred—'whichever is later'—within ten years of the charged crime." 454 N.J. Super. at 606, 608. We held that "an individual serving a probationary term cannot be considered to be confined within the meaning of N.J.S.A. 2C:44-3(a)," id. at 611 (footnote omitted), because "[b]eing on probation is not the same as being 'confine[d]' within the meaning of N.J.S.A. 2C:44-3(a)." Id. at 609 (second alteration in original).

Acknowledging that "the Legislature did not define the word 'confinement,'" we applied "its 'generally accepted meaning,'" and concluded

that "[t]he Legislature undoubtedly meant that 'confinement' would not occur unless the defendant had been deprived of his freedom by governmental authorities." Id. at 609-10.

> The reason for this interpretation seems obvious. The statute was intended to create the judicial discretion to impose an extended term on an individual incapable of living a law-abiding life for a significant period of time. Our Legislature fixed that period of time at ten years, thus conveying that an individual who is capable of residing in our communities for more than ten years without committing a crime should not be treated as a persistent offender. The portion of the statute that views that ten-year period as commencing from the individual's release from "confinement" simply deprives that individual of the ability to illogically argue a preceding ten-year crime-free life when that individual was only able to remain crime-free because of imprisonment.[4] An individual on probation, while living with some limitations, is out in society and remains capable of committing a crime. Remaining crime free during the preceding ten years—even when serving a probationary term during part or all of that ten years—demonstrates that individual's ability to lead the ten-year crime-free life anticipated by our Legislature when enacting N.J.S.A. 2C:44-3(a).

---

[4] On the other hand, the underlying rationale for N.J.R.E. 609 is the belief that a person who has lived contrary to "the rules of society and the discipline of the law" by committing crimes should not be able to shield his or her credibility from the jury and present himself or herself as a law-abiding individual. State v. Sinclair, 57 N.J. 56, 64 (1970) (quoting State v. Harless 459 P.2d 210, 211 (1969)); see also Sands, 76 N.J. at 145 ("A jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is more likely to ignore the oath requiring veracity on the witness stand than a law abiding citizen.").

[Id. at 610.]

In State v. Boykins, the issue was whether the defendant, who received a second extended-term sentence for a crime he committed "while he was on probation and out on bail awaiting trial" on the offense for which he received his first extended-term sentence, "was 'in custody' within the meaning of [N.J.S.A.] 2C:44-5(b) when he committed the second offense" and "thus not subject to the statute's prohibition against multiple extended terms." 447 N.J. Super. 213, 214-15, 217-18, 223 (App. Div. 2016). We concluded defendant committed the second offense "while he was 'in custody' as that term was understood by the drafters of [N.J.S.A.] 2C:44-5(b), and therefore that his second extended-term sentence was not illegal." Id. at 217-18.

Unlike Clarity, in Boykins, we rejected the defendant's argument that being "on probation or on bail" is "contrary to the . . . conventional meaning" of the term being "'in custody.'" Id. at 220 (quoting N.J.S.A. 2C:44-5(b)). We explained that "[a]lthough there [was] no disputing that [a] defendant would not be entitled to jail credit for the time he spent on probation or on bail prior to his trial" pursuant to Rule 3:21-8, "[j]ust because the phrase 'in custody' appears in both N.J.S.A. 2C:44-5(b) and in Rule 3:21-8 does not mean it means the same thing in both texts." Boykins, 447 N.J. Super. at 220; see State v. DiCarlo, 67 N.J. 321, 325 (1975) (noting "the adventitious occurrence

14

of like or similar phrases, or even of similar subject matter, in laws enacted for wholly different ends will normally not justify applying the rule" of in pari materia as an aid in statutory construction).

More to the point, in R.J.M., we considered the definition of confinement in relation to N.J.R.E. 609, but in a different context. There, the issue was "whether the time period during which a defendant has been civilly committed pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38, must be included in determining the ten-year time period" for purposes of N.J.R.E. 609(b)(1). 453 N.J. Super. at 264. "We h[e]ld that because civil commitment is not confinement 'for' the crime of which a defendant was convicted, the period of civil commitment must be included in determining the ten-year time period." Ibid. We noted that "[t]aken in context, 'confined' clearly refers to the custodial portion of a defendant's criminal sentence, and is not a more general reference to any deprivation of physical liberty." Id. at 269.

Federal courts have consistently held that "confinement" in Rule 609(b) of the Federal Rules of Evidence does not include periods of probation. See Fed. Rules Evid. 609(b) (providing that "if more than [ten] years have passed since the witness's conviction or release from confinement for it, whichever is later," evidence of the conviction is only admissible if "its probative value . . .

substantially outweighs its prejudicial effect; and . . . the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use").  Although N.J.R.E. 609 "departs significantly from its federal analog," because a "conviction or release from confinement for it," appears in both rules as the starting point for the calculation of the ten-year time period, the federal courts' interpretation of confinement is instructive.  State v. Harris, 209 N.J. 431, 442, 444 (2012).

In United States v. Stoltz, the court held consistent with "[its] sister circuits" that "'confinement' for purposes of the ten-year time limit in Rule 609(b) does not include periods of probation."  683 F.3d 934, 939 (8th Cir. 2012) (quoting United States v. Rogers, 542 F.3d 197, 201 (7th Cir. 2008)). "Rather, Rule 609(b)'s '[ten-year] clock starts at the witness's release from any physical confinement, or in the absence of confinement, the date of the conviction.'"  Ibid. (alteration in original) (quoting Rogers, 542 F.3d at 201). In Rogers, the court specified "Rule 609(b) unambiguously starts the clock at the date of conviction or release from 'confinement,' without any mention of periods of probation or parole."  542 F.3d at 200.

In United States v. Daniel, where the court also concluded that "'confinement' excludes probationary periods," 957 F.2d 162, 168 n.4 (5th Cir. 1992), to support its decision, the court pointed to "the change in the language

of the rule" from the pre-1972 language "that the ten-year period should run from 'the expiration of the period of . . . parole, probation, or sentence,'" to the current amended language "that a conviction is not admissible if more than ten years have elapsed since 'release from confinement.'" Id. at 168. The court determined "[t]he change in the language . . . forecloses the interpretation [that release from confinement includes probation]." Ibid.; see also United States v. Butch, 48 F. Supp. 2d 453, 465 (D.N.J. 1999) ("In calculating [609(b)'s] ten year period, the term 'release from confinement' does not include any period of probation or parole.").

Other states with rules similar to Rule 609(b) of the Federal Rules of Evidence have followed the lead of the federal courts and held that confinement does not include that portion of a sentence served while on probation. See Allen v. State, 687 S.E.2d 799, 803 (Ga. 2010) (holding that "probation does not qualify as confinement" under Georgia's equivalent of Fed. Rules Evid. 609(b)); State v. Shands, 817 S.E.2d 524, 533 (S.C. Ct. App. 2018) ("[P]robation and parole do not constitute 'confinement' for the purposes of Rule 609(b); confinement ends when a defendant is released from actual imprisonment."); Commonwealth v. Treadwell, 911 A.2d 987, 991 (Pa. Super. Ct. 2006) ("[W]e agree with the federal courts and our sister states, and conclude that probation does not qualify as confinement under Pennsylvania

17

Rule 609(b)," which "was modeled after and differs only slightly from Federal Rule of Evidence 609(b)."); State v. Dunlap, 930 P.2d 518, 538 (Ariz. Ct. App. 1996) (holding that "probation is not confinement and does not extend the time for measuring the ten-year period" of Arizona's Rule 609(b), which "source" is "the federal rule").

We are persuaded that the plain language of N.J.R.E. 609, coupled with the construction of identical language by the federal courts and sister states, as well as our prior interpretation of confinement in both related and unrelated contexts lead us to conclude that probation does not qualify as confinement under N.J.R.E. 609(b)(1). As we stated in Clarity, the "generally accepted meaning [of confinement] requires that the confined individual be 'imprisoned or restrained,' 'deprive[d] . . . of . . . liberty,' or 'place[d] in prison or jail.'" 454 N.J. Super. at 609 (alterations in original) (first quoting Black's Law Dictionary 362 (10th ed. 2014), then quoting Ballentine's Law Dictionary 244 (3d ed. 1969)). Although a defendant is not technically a free citizen while on probation, he or she is no longer confined or imprisoned as required under N.J.R.E. 609(b)(1).

Here, because more than ten years lapsed between defendant's 2005 conviction and his 2017 trial, and he was not confined while on probation for the 2005 conviction, both prior convictions were presumptively inadmissible

and the judge erred in ruling to the contrary. Because the judge erroneously admitted the convictions under N.J.R.E. 609(a)'s less stringent standard, she did not consider the N.J.R.E. 609(b)(2) factors and did not analyze the admissibility of the prior convictions under N.J.R.E. 609(b)(1)'s more stringent standard. Thus, we conclude the judge's evidentiary ruling constituted a mistaken exercise of discretion.

Next, we address whether the ruling was harmless error. Rule 2:10-2 directs reviewing courts to disregard "[a]ny error or omission . . . unless it is of such a nature as to have been clearly capable of producing an unjust result." "[T]hat rule 'requires that there be "some degree of possibility that [the error] led to an unjust result."'" State v. Scott, 229 N.J. 469, 484 (2017) (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330 (2005)). "The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." R.B., 183 N.J. at 330 (alteration in original).

While the "[e]xclusion of testimony, . . . which is central to a defendant's claim or defense, 'if otherwise admissible, cannot be held to be harmless error,'" when it comes to a defendant's testimony, "we look to evidence outside of defendant's testimony because it is the 'sort of evidence that a jury naturally would tend to discount as self-serving.'" Scott, 229 N.J. at 484 (quoting

<u>Skipper v. South Carolina</u>, 476 U.S. 1, 8 (1986)). Thus, under this standard, if the evidence is strong, and a limiting instruction is given to mitigate the error, the error may be harmless.

Here, defendant understandably declined to testify in light of the judge's ruling that if he did so, the State could impeach him with his prior convictions. However, the State's evidence was so strong that had defendant testified, there was no real possibility that the jury would have reached a different result. While defendant challenged the detectives' credibility, particularly whether they actually observed a handgun in his waistband, their credibility was corroborated by the fact that a handgun was, in fact, recovered from that precise location.

Further, at defendant's request, the judge instructed the jury that it may not draw any inferences adverse to defendant on the basis of his failure to testify. <u>See</u> <u>State v. Haley</u>, 295 N.J. Super. 471, 475 (App. Div. 1996) (holding that the trial judge's failure to instruct the jury that it may not draw an adverse inference from a defendant's exercise of the right not to testify is an error of constitutional magnitude which requires reversal of any resulting conviction). Thus, given the strength of the State's evidence and the limiting instruction provided by the judge, the erroneous evidentiary ruling was not of

20

"such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.

III.

In Point II, defendant argues that the judge's "limited questioning" during jury deliberations when a juror reported to the judge that another juror "had made comments that several jurors took to be racially biased," was "insufficient to ensure the integrity of deliberations," and to ensure "that racial bias had not tainted jury deliberations." Defendant asserts that because the error was "a structural one," his convictions must be reversed.

After deliberations began, Juror 7 indicated she wanted to address the judge. In counsel's presence, after being cautioned by the judge not to discuss the deliberative process, the juror reported "a comment that somebody made that sounded really like they were being racially . . . bias[ed] towards the situation." According to Juror 7, when "several jurors" told the purportedly offending juror she could not "make any opinions[] because of . . . race," the offending juror said she was "going to stand up for the [B]lack community" and "just kept insisting that she[ was] not going to let another [B]lack person go to jail for no reason."[5] When the judge asked Juror 7 whether the

---

[5] Defendant is African American.

discussion "affect[ed her] ability to serve" and "follow the instructions of the law," the juror responded it did not.

Relying in part on State v. Jenkins, 182 N.J. 112 (2004), the judge informed counsel that she intended "to remind [all the jurors] of their responsibility to adhere to the oath, and to follow the law," and then inquire whether anyone was unwilling or unable to comply. Depending on the responses, the judge would then address individual jurors as necessary. While the prosecutor requested that the offending juror, identified as Juror 10, be "interviewed, and then potentially stricken based upon her answers," defense counsel posed no objection to the judge's proposal.

After the judge gave the supplemental instructions, she told the jurors to communicate their responses in writing and cautioned them against discussing their deliberations in those communications. After a short recess, the jury sent the judge a note indicating they were "ready to proceed," prompting the judge to resume with the playback of testimony that had previously been requested by the jury. After the playback was completed, the prosecutor renewed his request to interview Juror 10, and added that the remaining jurors should "be voir dired" to assess "taint[]." Based on the prosecutor's request, to which defense counsel objected, the judge agreed to "conduct the extensive inquiry

. . . required by [State v. Brown, 442 N.J. Super. 154 (App. Div. 2015)]," beginning with the questioning of Juror 10.

Prior to the individual questioning, the judge instructed all the jurors "not to speculate, conjecture, or draw any inferences" regarding the "inquiry or discuss anything about it among [themselves]." As to Juror 10, in response to the judge's specific question whether she commented that she was "going to stand up for the [B]lack community," and that she was "not going to let another [B]lack person go to prison for no good reason," Juror 10 denied making the comments. Instead, Juror 10 admitted commenting that she did not "want to see . . . a [B]lack male found guilty, when [they were] not sure of the evidence." The judge then asked Juror 10 whether she was able "to adhere to [the] oath" and "reach a verdict based . . . solely on the evidence . . . presented, and the law as . . . instructed," to which Juror 10 responded affirmatively.

Next, the judge questioned the remaining deliberating jurors individually, asking each juror whether "anyone . . . made any comment that would affect [his or her] ability to be a fair and impartial juror" and, if not, whether he or she was "able to make any decision . . . solely on the evidence . . . presented in court, and . . . [the] law as . . . instructed." Although Juror 3 indicated that "there was a little argument going on that [he] totally missed," all the jurors, including Juror 3, responded negatively to the first question, and

affirmatively to the second.[6] Thereafter, the judge concluded that based on the jurors' responses to her "[earlier] general inquiry," as well as the individual questioning, she was satisfied that "[the jurors] could be fair and impartial," and thus resumed deliberations. The jury reached a unanimous verdict later that same day.

"[A]n allegation that a juror is racially biased strikes at the very heart of the defendant's right to a trial by an impartial jury." State v. Phillips, 322 N.J. Super. 429, 442 (App. Div. 1999). "A juror who would decide a case based solely on a defendant's race," even if the "defendant stood to benefit," or "on a personal identification or revulsion with a defendant, without regard to the evidence . . . violates [his or] her oath." Jenkins, 182 N.J. at 128, 131. Likewise, "[a] juror . . . who announces that [he or] she cannot obey [his or] her oath, follow the law, and render fair and impartial justice cannot remain on the jury." Id. at 128. "To rule otherwise would be to yield to a notion that is anathema to our scheme of justice—that a juror, judging the fate of a defendant, can be a law unto [himself or] herself." Ibid. For that reason, our Supreme Court has held that "a juror who expressly states that [he or] she cannot be impartial or that [he or] she is controlled by an irrepressible bias, and therefore will not be controlled by the law, is unable to continue as a juror

---

[6] The two alternates were not questioned.

for purposes of <u>Rule</u> 1:8-2(d)(1), and must be removed from a jury." <u>Ibid.</u>; <u>see</u> <u>R.</u> 1:8-2(d)(1) (governing the removal and substitution of jurors both before and after the commencement of deliberations).

In <u>Brown</u>, we stated:

> Our pretrial jury selection screening process is designed and intended to detect and filter out jurors who harbor views or beliefs that are per se incompatible with the judiciary's mission to deliver equal justice under law. However, like all things designed by the human mind, the pretrial jury selection process is not perfect. This requires our colleagues at the trial level to be in a constant state of vigilance throughout a jury trial for any signs of racial bias or other extraneous matters that may affect a juror's impartiality. Once a juror's latent or overt racial bias is discovered, the juror must be removed from the jury. Thereafter, the judge must conduct a comprehensive, fact-sensitive inquiry to determine whether the removed juror's odious beliefs are shared by any other member of the jury or has otherwise tainted the remaining jurors to such an extent that a mistrial is warranted.
>
> [442 N.J. Super. at 159-60.]

During the inquiry, to "forestall the inadvertent disclosure of confidential information by a juror" that "could damage the deliberative process and improperly influence the decisions that must be made by both counsel and the court," courts "must caution a juror at the outset of the colloquy that [he or] she must not reveal the way in which any juror plans to vote, or the vote tally on a verdict." <u>Jenkins</u>, 182 N.J. at 134. Thereafter, "[a]

complete inquiry into the context in which the juror's remark was made and its impact on the jury's deliberation process" should be conducted. Phillips, 322 N.J. Super. at 441; see State v. Scherzer, 301 N.J. Super. 363, 488-90 (App. Div. 1997) (finding that the trial judge's investigation of a report of a juror conducting daily prayer sessions with the jury, during which the judge took "two full days to thoroughly question all of the jurors about their involvement in and feelings about the prayers and comments," supported the judge's finding that "no outside influences had infiltrated the jury room").

"[I]n defining the scope of the inquiry[,] . . . the breadth of the questioning should be sufficient to permit the entire picture to be explored" without "inject[ing] prejudice into the case where it otherwise did not exist." Phillips, 322 N.J. Super. at 441-42. To that end,

> [t]he court is obliged to interrogate the [offending] juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby. The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary.
>
> [State v. R.D., 169 N.J. 551, 558 (2001) (citing Pressler, Current N.J. Court Rules, cmt. 2 on R. 1:16-1 (2000)).]

While "the court should not simply accept the [offending] juror's word that no extraneous information was imparted to the others, the court's own

thorough inquiry of the juror should answer the question whether additional voir dire is necessary to assure that impermissible tainting of the other jurors did not occur." Id. at 561. "In some instances, the court may find that it would be more harmful to voir dire the remaining jurors because, in asking questions, inappropriate information could be imparted." Ibid.

We "review[] the trial court's jury-related decisions under the abuse of discretion standard." Brown, 442 N.J. Super. at 182. "This standard respects the trial court's unique perspective and the traditional deference we accord to trial courts in 'exercising control over matters pertaining to the jury.'" Ibid. (quoting R.D., 169 N.J. at 559-60); see R.D., 169 N.J. at 561 (holding that the abuse of discretion standard of review applies to trial court determinations regarding whether a juror has been tainted by extraneous information during a trial).

Here, the judge conscientiously fulfilled her duty and complied with the demanding standards applicable where allegations of racial bias are made. While defendant agrees with the judge's decision to question each juror individually, and does not suggest that Juror 10 should have been removed, defendant challenges the scope of the judge's inquiry, asserting that the questioning "was insufficient for the court to be sure that racial bias had not prejudiced jury deliberations." In that regard, defendant asserts the judge

A-0850-18T3

"made exactly the same errors as those identified in Brown," and conducted the "perfunctory questioning" disapproved in Phillips.

In Phillips, we reversed a murder conviction because of the inadequate questioning of the jurors after one juror claimed that another juror made a disparaging and offensive racial remark during deliberations. 322 N.J. Super. at 441-42. The judge excused the offended juror and replaced him with an alternate after the juror told the judge "he could not 'come to a clear verdict' because he was 'mad and angry.'" Id. at 435. At defense counsel's request, "[a]fter instructing the reconstituted jury to begin its deliberations anew, the judge asked the jurors whether [the excused juror] had spoken to them about his inability to continue serving in the case" and "whether any of the jurors had said anything 'offensive' during the earlier deliberations." Ibid. "No juror responded affirmatively." Ibid. We concluded "that the trial judge's perfunctory questioning of the reconstituted jury concerning [the excused juror's] dismissal was inadequate to protect the integrity of the proceedings." Id. at 441. We explained that the offending juror should have been identified and "questioned out of the presence of the other jurors," and "the remaining jurors should have been questioned singly by the judge to determine the impact, if any, of the [objectionable] reference." Ibid.

In Brown, we reversed the carjacking and related convictions of two defendants "because the trial judge failed to remove a deliberating juror who disclosed her racial bias" to the judge as well as to "two of her fellow jurors" who "were sympathetic" to her. 442 N.J. Super. at 158-59. Specifically, the offending juror "revealed how she immediately construed the presence of two African-American men in her all white neighborhood as a menacing sign of possible retaliation by [the] defendants, merely because they were also African-American men." Id. at 182. By "infer[ing] a sinister conspiratorial purpose from a facially innocuous event, based only on the race of the participants," the juror "revealed a deeply-rooted, latent racial bias that required her removal from the jury." Id. at 159. We determined that although the offending juror made "self-serving denial[s] of racial bias" when questioned by the judge, "[h]er initial instinctive[] subliminal association of race with criminality or [wrongdoing] far trumped her subsequent assurances of impartiality." Ibid.

We also held that the judge "failed to take proper measures to determine whether [the two jurors], who initially shared [the offending juror's] concern . . . harbored similar latent racial biases." Id. at 160. In that regard, we explained that while questioning the two jurors, the judge "failed to conduct a thorough and probing examination" by asking "open ended questions" or

29

asking them "to recite what [the offending juror] had told them" to determine whether they "were capable of discharging their duty to judge the evidence fairly and impartially." Id. at 160, 183.

We stressed that the errors were compounded by the "judge's reaction to [the offending juror's] revelations." Id. at 182. "The judge was not only oblivious to the juror's unmistakable racial bias, but . . . actually endorsed the juror's misguided apprehensions" and expressed a "willingness to accept racial bias in a juror as an unavoidable reality of life" in his "impromptu, sua sponte 'instructions' to the jury, made soon after the judge had finished interviewing the . . . jurors in his chambers." Id. at 182-83.

The facts in Brown and Phillips are distinguishable from the facts in this case. Unlike the circumstances in Brown, this case was not tainted by and contaminated with invidious racial bias and prejudice that prevented the jurors from evaluating the evidence fairly and impartially, and making a decision based only on the evidence presented at trial and the court's instructions on the law. Indeed, upon questioning, Juror 10 denied making the comments attributed to her, and essentially admitted stating only that she did not want to find anyone guilty, particularly "a black male," if the jurors were uncertain about the evidence. Nonetheless, Juror 10 confirmed for the judge that she was able to adhere to her oath, make a decision based only on the evidence,

follow the law, and render fair and impartial justice. Because the judge found Juror 10's affirmations credible, we are satisfied that defendant was not deprived of his right to a fair trial.

Likewise, through individual questioning, the judge confirmed that the remaining jurors were also able to render fair and impartial justice. Unlike Phillips, the judge conducted a thorough and probing examination of the remaining jurors, asking each of them an open-ended question to ascertain whether anyone had made a comment that would affect their ability to be fair and impartial, rather than posing a question that risked "inject[ing] prejudice into the case where it otherwise did not exist." 322 N.J. Super. at 441-42. Given the jurors' responses, which the judge credited, the judge determined there was no need to inquire further. Additionally, unlike Brown, where the judge "actually endorsed the juror's misguided apprehensions," 442 N.J. Super. at 182, the judge here properly exercised her sound discretion in handling the jury, and correctly determined that jury deliberations had not been tainted by racial bias to warrant a mistrial.

IV.

In Point III, defendant argues that his conviction for possession of a handgun without a permit should be reversed because the judge "erred in admitting the [NJSP no-permit] affidavit of a non-testifying witness" in

violation of "both the New Jersey Rules of Evidence and [his] constitutional right to confrontation." According to defendant, because the affidavit "was created by a state trooper in response to a request by the [ECPO]," for "the express purpose of [defendant's] criminal prosecution," and "was signed by a state trooper who never testified," the "affidavit was . . . testimonial and not admissible without the signer's appearance as a witness."

Under N.J.S.A. 2C:39-5(b), the State was required to prove that defendant was "knowingly . . . in . . . possession [of a] handgun . . . without first having obtained a permit to carry the same." To meet the "no-permit" requirement, through the testimony of Detective Cosgrove, the State offered into evidence an affidavit with a raised seal, signed by NJSP Detective Brett Bloom of the NJSP Firearms Investigative Unit, notarized on August 1, 2017, and attesting to the fact that a search of the NJSP database revealed that there was no permit to carry a firearm issued to defendant on record with the State. Defendant objected to the admission of the affidavit "without any witness or foundation."

The judge acknowledged that the affidavit constituted hearsay, but qualified for admission under N.J.R.E. 803(c)(7),[7] the exception permitting the admission of

> [e]vidence that a matter is not included in a . . . record kept in accordance with . . . [N.J.R.E.] 803(c)(6),[8] when offered to prove the . . . nonexistence of the matter, if the matter was of a kind of which a . . . record was regularly made and preserved, unless the sources of information or other circumstances indicate that the inference of . . . nonexistence is not trustworthy.

Additionally, notwithstanding the testimony of Detective Cosgrove, the judge admitted the affidavit under N.J.R.E. 902,[9] providing that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to" a "document purporting to bear a signature affixed in an official capacity by an officer or employee of the State of New Jersey."

---

[7] We note that N.J.R.E. 803 has been amended since the trial.

[8] N.J.R.E. 803(c)(6) permits the admission of:

> [a] statement contained in a writing or other record . . . made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business . . . unless the sources of information . . . indicate that it is not trustworthy.

[9] We note that N.J.R.E. 902 has also been amended since the trial.

A-0850-18T3

N.J.R.E. 902(a); see also N.J.R.E. 902(k) (providing that "[a] writing asserting the absence of an official record" authenticated as prescribed under N.J.R.E. 902(a) is a valid self-authenticating document). The judge noted that the notarized affidavit bore the raised seal of a governmental agency and was signed by an officer of the NJSP acting in his official capacity as the supervisor of the Firearms Investigative Unit.

We review "evidentiary rulings" by a trial judge under an "abuse of discretion" standard. State v. Gorthy, 226 N.J. 516, 539 (2016). "Hearsay is not admissible except as provided by [the Rules of Evidence] or by other law." N.J.R.E. 802. Under our evidence rules, the "no-permit" affidavit constitutes hearsay and is therefore only admissible if an exception to the prohibition against hearsay applies. Applying these principles, we discern no abuse of discretion in the judge's application of the hearsay rules to the State's proffer of the "no-permit" affidavit. The affidavit was properly admitted under N.J.R.E. 803(c)(7) and N.J.R.E. 902(a) and (k). See State v. Rogers, 177 N.J. Super. 365, 375 (App. Div. 1981) (allowing an affidavit by a non-testifying officer of the NJSP Firearms Identification Unit indicating that there was no record of issuance of, or application for, a permit by the defendant to "negate the existence of a permit.").

Having concluded that the affidavit is admissible under the hearsay rules, we must next "address whether [it is] testimonial and thus run[s] afoul of the Confrontation Clause's guarantee" as "embodied in either the federal or our State Constitutions."[10]   State v. Sweet, 195 N.J. 357, 368, 374 (2007); U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10.   "[I]f it is, then the fact of admissibility for purposes of the exceptions to the hearsay rules is insufficient." State v. Chun, 194 N.J. 54, 138-39 (2008).   "That is to say, if the evidence is testimonial, reliability as defined by the exceptions to the hearsay rules does not equate with, and cannot substitute for, confrontation through cross-examination." Id. at 139.

"Under the standard set forth in Crawford, a testimonial statement against a defendant by a non-testifying witness is inadmissible under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him or her." Wilson, 227 N.J. at 545 (citing Crawford, 541 U.S. at 59).   "The threshold issue is, thus, whether the proffered statement is 'testimonial' in nature." Ibid.  In Crawford, the Court

---

[10]   While defendant did not expressly make a Confrontation Clause objection to the affidavit in the trial court, a defendant is not "require[d] to specifically use the terms 'Confrontation Clause' or 'Sixth Amendment' or to refer to [Crawford v. Washington, 541 U.S. 36 (2004)] to preserve a Confrontation Clause challenge." State v. Wilson, 227 N.J. 534, 543 (2017).  Thus, we find the substance of defendant's objection to be sufficient to raise a Confrontation Clause challenge.

A-0850-18T3

described the class of testimonial statements covered by the Confrontation Clause as follows:

> Various formulations of this core class of testimonial statements exist: [ex parte] in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.
>
> [541 U.S. at 51-52 (second alteration in original) (citations and internal quotation marks omitted).]

"Although the Crawford Court refrained from offering a 'comprehensive definition' of the term," Wilson, 227 N.J. at 545 (citing Crawford, 541 U.S. at 68), in Wilson, our Supreme Court "upheld the primary purpose test originally announced in [Davis v. Washington, 547 U.S. 813 (2006)] and developed in pre-[Williams v. Illinois, 567 U.S. 50 (2012)] case law." Wilson, 227 N.J. at 546. Under the primary purpose test, "the question is whether, in light of all the circumstances the 'primary purpose' of the evidence was to 'create an out-of-court substitute for trial testimony.'" Id. at 547 (alterations omitted) (quoting Ohio v. Clark, 576 U.S. 237, 245 (2015)).

36

Although our courts have not applied the "primary purpose" test to a "no-permit" affidavit to date, the test has been applied in a variety of other contexts. In <u>Wilson</u>, the Court determined that "the map, prepared and adopted by a governmental entity" and used in the defendant's drug distribution related prosecution was not testimonial. 227 N.J. at 549. The Court acknowledged that the map was "used in criminal prosecutions and was created, in part, for that purpose." <u>Id.</u> at 551. Nonetheless, the Court explained that the map "does not conclusively establish . . . guilt," depicted "an objective measurement that require[d] no 'independent interpretation' of raw data," and "report[ed] a present fact." <u>Id.</u> at 550-51 (quoting <u>State v. Roach</u>, 219 N.J. 58, 81 (2014)).

Furthermore, the map did not "target a particular person" and "may exonerate a person charged with violating N.J.S.A. 2C:35-7.1(a)," prohibiting distribution of a controlled dangerous substance within 500 feet of a public park. <u>Id.</u> at 551.

> Importantly, the map was not created in response to a criminal event. The map was created years before the commission of any of the offenses alleged here. When the map was produced, there was no alleged crime committed by defendant. Nor was the map created to establish a fact relevant to an ongoing police investigation.

> Therefore, the map was not created for the primary purpose of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution."
>
> [Ibid. (alterations in original) (quoting State v. Bass, 224 N.J. 285, 314 (2016)).]

See also Bass, 224 N.J. at 317 (finding an autopsy report that had been prepared by a medical examiner who was deceased at the time of the defendant's trial was testimonial because its primary purpose was "to establish facts for later use in the prosecution of [that] case"); Roach, 219 N.J. at 81 (finding that a DNA profile created by a State forensic scientist from machine-generated data that required "subjective analysis" and "independent interpretation" of the raw data was testimonial); State v. Michaels, 219 N.J. 1, 9, 44 (2014) (finding that a report signed by a supervisor at a private lab certifying that the defendant would have been unfit to drive based on the presence of illegal drugs in his blood was testimonial because its primary purpose was to serve as a "direct accusation against [the] defendant" in the ensuing vehicular homicide prosecution); Chun, 194 N.J. at 147 (finding the printout on which the Alcotest reports its readings measuring a person's blood alcohol level was not testimonial because the printout "reports a present, and not a past, piece of information or data," cannot be influenced by the Alcotest operator, "and may as likely generate a result that exonerates the test subject as convicts him or her").

In Melendez-Diaz v. Massachusetts, the United States Supreme Court determined that documents attesting to the non-existence of a particular record (often referred to as Certificates of Nonexistence of a Record or CNRs) "fall within the 'core class of testimonial statements'" covered by the Confrontation Clause. 557 U.S. 305, 310 (2009). There, the documents at issue that were found to be testimonial consisted of notarized certificates prepared by State analysts "showing the results of the forensic analysis performed" on the substances seized from the defendant in his drug trafficking prosecution. Id. at 308.

We acknowledge a split among federal and state courts as to whether certain CNRs are testimonial and thereby subject to the Confrontation Clause. See, e.g., United States v. Burgos, 539 F.3d 641, 645 (7th Cir. 2008) (finding that "CNR[s] are nontestimonial business records not subject to the requirements of the Confrontation Clause under Crawford"); United States v. Urqhart, 469 F.3d 745, 748-49 (8th Cir. 2006) ("[L]ikening the CNR to a business record, we follow the lead of our sister circuits and hold that a CNR is nontestimonial evidence under Crawford."); United States v. Cervantes-Flores, 421 F.3d 825, 833-34 (9th Cir. 2005) (holding that the CNR, certifying no record of consent to reenter the United States, belonged to a "class of records . . . kept in the ordinary course of the [agency's] activities, prior to and

39

regardless of [the defendant's] prosecution," and was therefore nontestimonial evidence under <u>Crawford</u> notwithstanding the fact that the CNR was made "at the request of the prosecutor").  <u>But cf.</u> <u>United States v. Orozco-Acosta</u>, 607 F.3d 1156, 1164 (9th Cir. 2010) (holding that the CNR, certifying no record of consent for re-admission into the United States, was testimonial but the violation of the defendant's confrontation right caused by its admission was harmless error); <u>United States v. Martinez-Rios</u>, 595 F.3d 581, 586 (5th Cir. 2010) (holding that because the CNR, certifying no record of consent to reapply for admission to the United States, was "exclusively generated for use at trial" and was used to establish a "fact necessary to convict," it was testimonial and triggered the Confrontation Clause); <u>Tabaka v. District of Columbia</u>, 976 A.2d 173, 175-76 (D.C. Cir. 2009) (holding that the CNR generated by a Department of Motor Vehicle official, certifying no record of an operator's permit having been issued to the defendant, was testimonial and improperly admitted without the testimony of the affiant in the defendant's drunk driving related prosecution); <u>Washington v. State</u>, 18 So. 3d 1221, 1223-25 (Fla. Dist. Ct. App. 2009) (holding that the CNR prepared by a State Licensing Board employee, certifying no contractor's license had been issued to the defendant, was testimonial and its admission in the defendant's

prosecution for acting as an unlicensed contractor violated the Confrontation Clause but "was harmless given the other evidence").

We find the analysis used by the Virginia appellate court in <u>Harris v. Commonwealth</u>, 673 S.E.2d 483 (Va. App. 2009) instructive. There, the defendant was convicted of failure to re-register as a sex offender. <u>Id.</u> at 484. On appeal, he argued the trial court violated the Confrontation Clause by admitting an affidavit prepared by the "custodian of the records for the Virginia State Police Sex Offender Registry" attesting to the fact that their records showed no sex offender registration form on file for the defendant during the relevant time period. <u>Ibid.</u>

In concluding that the affidavit was not testimonial in nature, the court explained

> the affidavit in question here is a document establishing the existence or absence of some objective fact, rather than detailing the criminal wrongdoing of the defendant. It was prepared in a non-adversarial setting, and is not accusatory. The affiant simply generated the document from objective facts already in existence. The sex offender registry is a neutral repository of information that reflects the objective results of a search of public records. The information contained in the affidavit simply summarizes the official registry of the Department of State Police . . . .
>
> [<u>Id.</u> at 487 (citations and internal quotation marks omitted).]

41

Likewise, here, the NJSP "no-permit" affidavit is not testimonial. The affidavit establishes the absence of an objective fact, rather than detailing the criminal wrongdoing of defendant. It is not accusatory in nature and is generated from facts already in existence. The information contained in the affidavit simply summarizes information in the NJSP's official database, which is a neutral repository for such information. Importantly, the database was not created in response to a criminal event, or to establish a fact relevant to an ongoing police investigation. It was created before any alleged crime by defendant, and could have just as easily generated a response that exonerated defendant. As in Harris, "while the affidavit may have been prepared with an eye towards litigation, the underlying records are not prepared in anticipation of litigation." Id. at 486. Because the affidavit is not testimonial, its admission without Bloom's testimony did not violate the Confrontation Clause.

## V.

In Point IV, defendant argues the motion judge "erred in finding that the [S]tate had established the legality of the search without holding a testimonial suppression hearing, despite the fact that the defense version of events was materially different from that of the [S]tate." Defendant urges us to "remand for a testimonial suppression hearing."

Pursuant to Rule 3:5-7(c), governing hearings in motions to suppress evidence, "[i]f material facts are disputed, testimony thereon shall be taken in open court." Our Supreme Court has also clarified that

> [t]he proper mechanism through which to explore the constitutionality of warrantless police conduct is an evidentiary hearing.
>
> At evidentiary hearings, the State presents witnesses to substantiate its basis for the challenged warrantless conduct, and the defense is afforded the opportunity to confront and cross-examine the State's witnesses.
>
> [State v. Atwood, 232 N.J. 433, 445 (2018) (citations omitted).]

See also State v. Parker, 459 N.J. Super. 26, 28 (App. Div. 2019) (reversing the motion judge's ruling because the judge "suppressed the physical evidence without conducting an evidentiary hearing" where "the parties dispute[d] the material facts that led to [the] defendant's arrest and subsequent indictment").

> The rule provides that the filing of a motion by a defendant asserting that evidence to be used against him was seized in a warrantless search triggers a requirement that "the State shall, within fifteen days of the filing of the motion, file a brief, including a statement of facts as it alleges them to be, and the movant shall file a brief and counter statement of facts no later than three days before the hearing."
>
> [State v. Green, 346 N.J. Super. 87, 90 (App. Div. 2001) (quoting R. 3:5-7(c)).]

However, "[i]t is only when the defendant's counter statement places material facts in dispute that an evidentiary hearing is required." Id. at 90-91 (citing State v. Hewins, 166 N.J. Super. 210, 213-15 (Law Div. 1979), aff'd, 178 N.J. Super. 360 (App. Div. 1981)).

"The mere allegation of a warrantless search, with the attendant burden of proof on the State to justify same, does not place material issues in dispute, nor does defendant's assertion that he denies the truth of the State's allegations." Id. at 91. Indeed, the moving papers should be "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." Hewins, 166 N.J. Super. at 215 (quoting United States v. Ledesma, 499 F.2d 36, 39 (9th Cir. 1974)); see also State v. Kadonsky, 288 N.J. Super. 41, 46 (App. Div. 1996) ("In the absence of factual allegations to support the claim that the search and seizure were illegal, a hearing was not required and the motion to suppress was properly denied.").

Here, at the hearing on defendant's motion to suppress the handgun and cocaine seized at the time of his arrest, the motion judge correctly posited that "the threshold issue [was whether] there [was] a genuine issue of material fact warranting a[n evidentiary] hearing." The judge elaborated that in order "[t]o raise such material fact," defendant "provided a certification" and "a best

44                                                                    A-0850-18T3

efforts at a transcript of the [central] dispatch" tape. In the certification, defendant stated:

> I was stopped allegedly because I . . . was observed while urinating in the alleyway. Police claimed they saw a handgun in my waistband. The incident report states that the police came into contact based upon an anonymous tip; however, I reviewed the radio dispatch recordings for the police communications surrounding the event of my crime. There's no mention of an anonymous tip specifically being observed in the alleyway.

The judge determined an evidentiary hearing was not warranted because there were no material facts in dispute, and the motion could therefore "be decided on the papers and [defendant's] certification." The judge explained that because "the dispatch recording [was] neither intended, nor . . . practically function[ed as] . . . a memorialization of the entirety of an investigation, . . . the fact that nothing . . . referenc[ed] the anonymous tip [was] of no moment and [did] not contribute to the existence of a material fact." The judge continued that "[t]he reference to the [confidential informant (CI)]" was "also irrelevant because the . . . CI [was] referenced only to place the officers at the physical location" where "they made observations which [were] set forth in the report of [defendant] urinating" and exposing "the butt of a handgun."

The judge denied defendant's motion, concluding the State sustained its burden of establishing the applicable exceptions to the warrant requirement to

prove the legality of the searches. According to the judge, the plain view exception applied because the detectives, who were "experienced" in identifying handguns, were "lawfully in the viewing area" when they inadvertently observed the handgun in defendant's waistband. See State v. Gonzales, 227 N.J. 77, 101 (2016) ("Under the plain-view doctrine, the constitutional limiting principle is that the officer must lawfully be in the area where he observed and seized the . . . contraband, and it must be immediately apparent that the seized item is evidence of a crime.").

The judge also found that the search incident to arrest exception applied because the contraband was seized from defendant's person following a lawful arrest. See State v. Oyenusi, 387 N.J. Super. 146, 153 (App. Div. 2006) ("[W]hen the police arrest a suspect, they may conduct a search of his 'person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.'" (quoting Chimel v. California, 395 U.S. 752, 763 (1969))). The judge's findings are amply supported by the record and his legal conclusions are sound. See State v. Elders, 192 N.J. 224, 245 (2007) (applying a "deferential standard of review to the motion judge's findings"). Aside from disputing the anonymous tip which had no relevance to the detectives' plain view observations, defendant provided no facts in his written submission to

place material issues in dispute. Accordingly, the judge did not err in adjudicating defendant's suppression motion without an evidentiary hearing.

## VI.

Finally, in Point V, defendant argues even if we find no individual errors warranting reversal, the "cumulative effect" of the individual errors "cast sufficient doubt upon the verdict to warrant reversal." See State v. Jenewicz, 193 N.J. 440, 473 (2008) ("We have recognized in the past that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal."). However, because we conclude there were no reversible errors, defendant's cumulative error argument must also fail.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION